# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

*Happy R Securities, LLC v. Agri-Sources, LLC*, 2013 IL App (3d) 120509

---

| | |
|---|---|
| Appellate Court Caption | HAPPY R SECURITIES, LLC, an Illinois Limited Liability Corporation, Assignee of First State Bank of Illinois, Plaintiff and Counterdefendant-Appellant, v. AGRI-SOURCES, LLC; THE INTERNAL REVENUE SERVICE, The Department of the Treasury, United States of America; THE DEPARTMENT OF REVENUE OF THE STATE OF ILLINOIS; JEFFERSON RIVER TERMINAL, a Division of Consolidated Grain and Barge Company, a Missouri Corporation; OQUAWKA RIVER TERMINAL, LLC; RYCO DISTRIBUTING, INC.; COUNTRY MUTUAL INSURANCE COMPANY; and UNKNOWN OWNERS and NONRECORD CLAIMANTS, Defendants (Oquawka River Terminal, LLC, an Illinois Limited Liability Company; and ROBERT W. RYAN, JR., JEFFREY BUTLER, and DAVID C. JOBE, Individually and as Members of Oquawka River Terminal, LLC, Counterplaintiffs-Appellees and Cross-Plaintiffs-Appellees; v. Kurt D. McChesney, Counterdefendant; Agri-Sources, LLC, Counterdefendant and Cross-Defendant). |
| District & No. | Third District<br>Docket No. 3-12-0509 |
| Filed | March 28, 2013 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | In an action arising from the foreclosure of a mortgage on a 20-acre parcel of commercial property, the lessee and contract purchaser of an 8-acre parcel within the 20-acre parcel was properly granted a preliminary injunction staying the foreclosure action and prohibiting the owners of the 20-acre parcel from taking possession of the 8-acre parcel, since the contract purchaser of the 8-acre parcel satisfied the requirements for the issuance of a preliminary injunction to preserve the status quo pending a decision on the merits of its claims for specific performance of the contract for sale and breach of fiduciary duty. |

| Decision Under Review | Appeal from the Circuit Court of Henderson County, No. 11-CH-13; the Hon. Paul L. Mangieri, Judge, presiding. |
|---|---|
| Judgment | Affirmed. |
| Counsel on Appeal | Timothy J. Howard (argued) and Jeffrey G. Sorenson, both of Howard & Howard Attorneys PLLC, of Peoria, for appellant. |
| | Patrick M. Griffin (argued) and Richard L. Williams, both of Griffin Villa Williams LLP, of Geneva, for appellees. |
| Panel | JUSTICE CARTER delivered the judgment of the court, with opinion. Justices O'Brien and Schmidt concurred in the judgment and opinion. |

## OPINION

¶ 1   First State Bank of Illinois (FSBI) filed a foreclosure action against numerous defendants regarding a 20-acre parcel of commercial property in Gladstone, Illinois. FSBI later assigned its rights under the mortgage to Happy R Securities, LLC (HRS). Oquawka River Terminal, LLC (ORT), filed counterclaims and cross-claims for specific performance, breach of fiduciary duty, and injunctive relief against HRS, Kurt D. McChesney, and Agri-Sources, LLC. After a hearing, the circuit court granted ORT's motion for a preliminary injunction, which, *inter alia*, stayed the foreclosure action and prohibited HRS, McChesney, and Agri-Sources from seeking or taking possession of an 8-acre parcel of land used by ORT that was contained within the aforementioned 20-acre parcel. HRS filed an interlocutory appeal, arguing that the circuit court erred when it granted ORT's motion for a preliminary injunction. We affirm.

¶ 2                                      FACTS

¶ 3   This case originated in the circuit court on September 9, 2011, when FSBI filed a foreclosure action against Agri-Sources regarding a 20-acre parcel of commercial property in Gladstone, Illinois. Numerous other defendants were added to the case, including ORT, and FSBI later assigned its rights under the mortgage to HRS. Subsequently, ORT filed counterclaims and cross-claims for specific performance (against Agri-Sources), breach of fiduciary duty to ORT (against McChesney), and injunctive relief (against McChesney, Agri-

-2-

Sources, and HRS). In its pleading, ORT alleged, *inter alia*, that:

"McChesney, while a member of both ORT and Agri-Sources, engaged in a calculated course of conduct intended to specifically benefit his personal and business interests at the expense of the protected business interests of the ORT Parties. Specifically, McChesney breached his fiduciary duty obligations to the ORT Parties by, among other things, failing to fully disclose his personal dealings which were adverse to the business of the ORT Parties, and by suppressing and then usurping the corporate opportunities of ORT, including in particular ORT's contractually protected right to purchase real estate vital to ORT's operations."

¶ 4　　The circuit court held a hearing over several days in March and April 2012 on ORT's motion for a preliminary injunction. While portions of the evidence were conflicting, the facts of this case can be generally summarized as follows.

¶ 5　　In 2007, Kurt McChesney and Mage Farms, LLC (which was owned by McChesney and his mother), formed Agri-Sources, LLC. At some point, Peter Rousonelos took over Mage Farms' ownership interest in Agri-Sources, which sold various agricultural products and services from a 20-acre parcel of commercial property in Gladstone, Illinois. This 20-acre parcel was owned by the Gladstone Grain Company (GGC), which was a salvage grain business owned by McChesney and his relatives.

¶ 6　　Also in 2007, Oquawka River Terminal, LLC (ORT), was formed by McChesney (25% membership interest), Mage Farms (25%; Rousonelos later took over Mage Farms' ownership interest), Jeffrey Butler (25%), David Jobe (12½%), and Robert Ryan, Jr. (12½%) to store, handle, and distribute agricultural fertilizer. ORT was based on an 8-acre parcel of land (the ORT Property) that was a part of the aforementioned 20-acre parcel owned by GGC. In 2007, ORT began leasing the use of two storage buildings located on the ORT Property from GGC (the Gladstone Lease).

¶ 7　　In December 2008, Agri-Sources purchased the 20-acre parcel (hereinafter the Agri-Sources Property) from GGC, and assumed GGC's position in the Gladstone Lease.

¶ 8　　ORT also entered into three other lease agreements related to its fertilizer business. In 2010, ORT was assigned Agri-Sources' rights under a lease to use a river dock owned by Consolidated Grain and Barge Company (the River Dock Lease). Also in 2010, ORT began leasing the use of a railroad spur located one-quarter mile from the ORT Property (the Railroad Spur Lease). In 2011, ORT began leasing the use of another building from Agri-Sources, which was to be used as overflow storage (the Hoop Building Lease).

¶ 9　　According to Ryan, the leases were essential to ORT's continued operation, as it received 75% of its shipments via railroad car and two of its major customers transported most of their product via the Mississippi River. Ryan testified that in March 2012, ORT received notice from HRS of the termination of the Hoop Building Lease and the Gladstone Lease. Ryan also testified that ORT had already lost a customer due to this case; the customer was approximately 10% to 15% of ORT's business. In addition, another customer of ORT testified that he would likely pull his fertilizer business if ORT could not continue to operate out of its current facility. This customer stated that ORT provided a particular blend of fertilizer that he could not obtain from other fertilizer businesses.

¶ 10     In mid-2009, ORT undertook an expansion of its business. ORT sought an expansion loan in 2010 from FSBI, which told ORT that it would not agree to fund the expansion until ORT substantially completed the improvements.

¶ 11     ORT used defendant RYCO Distributing, Inc. (RYCO), to install the improvements. RYCO was a construction business, primarily operating in the agricultural industry, which was owned by Ryan's parents and which employed Ryan, Butler, and Jobe. ORT used RYCO to fund the costs of the expansion. According to Ryan, RYCO (Ryan, Butler, and Jobe) agreed not to charge ORT finance charges, and the other two members of ORT, McChesney and Rousonelos, agreed as the owners of Agri-Sources not to charge ORT rent.[1] Ryan testified that he understood this agreement to last until the expansion loan was approved, while McChesney testified that he understood the agreement to last for only six months. RYCO completed the expansion and recorded a mechanic's lien on the property; the expansion allegedly cost over $400,000.

¶ 12     During mid-2010, FSBI changed its position on the expansion loan and told ORT that a traditional loan was no longer feasible. FSBI encouraged ORT to apply for a United States Small Business Administration (SBA) loan through FSBI. To do so, however, FSBI told ORT that Jobe could not be a party to the loan. Accordingly, Ryan drafted a new operating agreement in August 2010 for ORT (the 2010 ORT Operating Agreement), which Ryan, Butler, McChesney, and Rousonelos signed. The 2010 ORT Operating Agreement purported to change ORT from a member-managed limited liability company (LLC) to a manager-managed LLC, with Ryan to serve as the initial manager. Ryan testified that the 2010 ORT Operating Agreement was not supposed to take effect until the expansion loan was approved. McChesney testified that he understood the agreement to take immediate effect.

¶ 13     On August 18, 2010, two days after the 2010 ORT Operating Agreement was signed, ORT entered into an agreement with Agri-Sources to purchase the eight acres upon which ORT operated for $225,000 (the Purchase Agreement). Ryan made a capital call for ORT in the amount of $51,000. Ryan, Butler, and Rousonelos agreed that McChesney did not have to contribute to the capital call because he was experiencing financial difficulties.

¶ 14     The Purchase Agreement was originally supposed to be closed on October 15, 2010. However, the closing date was extended twice; first, to March 25, 2011, and second, to June 1, 2011. Apparently, the closing date was extended by Agri-Sources due in part to the inability to convey clear title. An FSBI vice president testified that liens and judgments on the Agri-Sources property had arrested the expansion loan process.

¶ 15     According to Ryan, ORT was still intent on consummating the Purchase Agreement by June 1, 2011, and he understood that FSBI was still willing to go forward with financing the Purchase Agreement at that time. Accordingly, ORT deposited 10% of the purchase price with a title company and provided notice to Agri-Sources that it was ready to close on the Purchase Agreement. However, McChesney's attorney sent an email to FSBI on June 3,

---

[1]Ryan also testified that McChesney and Rousonelos received credit in their shares of ORT for the free rent. McChesney testified that this credit was merely an option he was offered, to which he never agreed.

2011, which stated that McChesney, as a member of ORT, objected to closing.

¶ 16    The ORT members met with FSBI in July 2011 to resolve their growing issues, and everyone involved agreed to continue to work toward completing the Purchase Agreement. However, Ryan testified that in August 2011, he was told by FSBI that the junior liens on the Agri-Sources property totaled approximately $160,000 and were "tough to deal with" such that FSBI decided to foreclose on Agri-Sources instead.

¶ 17    While Ryan testified that McChesney was at all times a member of ORT and that McChesney had an 18% share in ORT at the time of the hearing in this case, McChesney testified that the other ORT members told him in August 2011 that he was out of ORT. Ryan testified that they never reduced McChesney's share in ORT to 0%. A federal Schedule K-1 tax form (form 1065) entered into evidence that was prepared for McChesney for tax year 2010 showed that he had a 0% share of ORT's profit, loss, and capital for that tax year. The FSBI vice president also testified that Ryan told him during the July 2011 meeting that McChesney was no longer a member of ORT.

¶ 18    Substantial testimony was also presented on McChesney's financial problems. John Bradley, a senior vice president of a Minnesota bank who also served as a consultant for FSBI, testified that around mid-2011, he was assigned to resolve McChesney's "troubled" relationship with FSBI. In total, McChesney was indebted to FSBI in the approximate amount of $3.3 to $3.4 million. McChesney's relationship with FSBI included personal loans made to McChesney, as well as chapter 11 (11 U.S.C. § 101 *et seq.* (2006)) bankruptcy proceedings involving M&K Farms Partnership, which McChesney testified was a business venture involving him and his mother.

¶ 19    McChesney testified that the M&K Farms Partnership entered bankruptcy proceedings in January 2011 and that the objective was to close the bankruptcy proceedings by the end of 2011. As a part of these proceedings, the M&K Farms Partnership sold over $1 million in machinery, and McChesney's mother sold at least $4 million in real estate from the Charles McChesney trust.

¶ 20    Documents introduced into evidence indicated that Bradley proposed a plan to restructure McChesney's debt with FSBI. Part of this plan included issuing a new loan to McChesney to retire several debts, including the Agri-Sources mortgage. A list of the plan's premises contained a statement that as the "Agri-Sources R.E." sells, the proceeds from that sale would reduce the principal of the new loan to McChesney; thus, "FSBI would adjust payments [on the new loan] accordingly." Under a list of "Benefits to Kurt," the plan stated, "FSBI will assign Agri-Sources note, mortgage, security agreements and other documents to Kurt, so that he can enforce documents and exercise rights. This means that Kurt can exercise lender's default rights against Peter Rousonelos and can also deal with delinquent tenant ORT." McChesney claimed that this assignment was always supposed to be made to HRS, which was an LLC that he formed on December 30, 2011. However, Bradley testified that at "past the eleventh hour," McChesney requested that FSBI assign its rights under the Agri-Sources mortgage to HRS, rather than McChesney himself. Bradley also stated that at the time McChesney requested the assignment be made to HRS, paperwork had already been drawn up in which McChesney was the assignee.

¶ 21      On May 23, 2012, the circuit court issued a written decision in which it granted ORT's motion for preliminary injunction. After a detailed recitation of the facts, the court discussed each of the four elements necessary to obtain a preliminary injunction. First, the court found that ORT established the possession of a clearly ascertainable right in that it had a contractual right to obtain a property interest in the ORT Property via the Purchase Agreement, in conjunction with the four lease agreements. The court noted that the Purchase Agreement was unique because:

> "it would allow ORT to: (a) secure a permanent base upon which to operate; (b) solidify its access to the rail spur by way of permanent easement; (c) allow it to recognize the full benefits of the secondary leases; and (d) allow it to realize the benefits of its some $400,000 improvements on the Agri-Sources property."

The court also noted that an issue exists as to whether the Purchase Agreement was still in effect, but because all that was required to obtain a preliminary injunction was a *prima facie* case, the court found that ORT had met its burden of proof under this element.

¶ 22      Second, the court found that ORT established that it had no adequate remedy at law without the preliminary injunction. In this regard, the court found that because the subject of the Purchase Agreement was land, money damages would be inadequate.

¶ 23      Third, the court found that ORT established that it would suffer irreparable harm without the preliminary injunction. Specifically, the court found that ORT had established a *prima facie* case that if HRS were able to foreclose on the Agri-Sources Property and require ORT to vacate the ORT Property, ORT would not be able to benefit from the improvements it made on the ORT Property and its business would likely cease to exist. The court also noted that ORT had already lost a portion of its business due to the litigation.

¶ 24      Fourth, the court found that ORT established that it was likely to succeed on the merits of its specific performance and breach of fiduciary duty claims. With regard to the specific performance claim, the court found that the evidence established that ORT and Agri-Sources entered into the Purchase Agreement, that ORT had performed under the contract, and that but for McChesney's conduct, the deal would have closed.

¶ 25      With regard to the breach of fiduciary duty claim, the court noted that to establish a likelihood of success, ORT had to establish that ORT was an LLC, that McChesney was a member of ORT at the time of the alleged breach, and that McChesney committed acts in violation of his fiduciary duties as a member of ORT.

¶ 26      The court found that the evidence established that ORT was an LLC, although the court noted that there was a question as to whether ORT was a member-managed LLC or a manager-managed LLC. The court noted that ORT's articles of organization listed it as a member-managed LLC and that it was registered with the Secretary of State as such. However, the court also noted that the August 2010 Operating Agreement purported to change ORT to a manager-managed LLC, although the evidence was conflicting on the effective date of that agreement. In addition, the court noted that the evidence indicated that both Ryan and McChesney engaged in acts that were both consistent and inconsistent with ORT being either a member-managed LLC or a manager-managed LLC.

¶ 27      The court also found that ORT had raised a fair question of whether McChesney was a

-6-

member of ORT at the time of the alleged breach. In this regard, the court listed the following inclusive factors:

> "[1] McChesney was listed as a member of ORT in ORT's original articles of organization; [2] he was identified and signed the original Operating Agreement for ORT dated May 11, 2007; [3] he was identified and signed as a member of ORT relative to the August 16, 2010, ORT Operating Agreement; [4] he signed the August 19, 2010, ORT accounts payable report as a member; [5] he was listed as a member of ORT, albeit with a 0% profit/loss percentage in ORT's 2010 Schedule K-1; [6] he identified himself as a member of ORT in a June 3, 2011, e-mail in which he objected to the ORT purchase of the Agri-Source Property; and [7] there are judicial admissions (or mistakes of record) in which McChesney identifies himself as a *current* member of ORT as compared to a *former* member of ORT." (Emphases in original.)

¶ 28 The court also found that ORT had raised a fair question of whether McChesney breached his fiduciary duties as a member of ORT. Specifically, the court found that ORT had established that McChesney failed to fully disclose his personal endeavors that were adverse to ORT's interests–namely, the acquisition of the Agri-Sources note through HRS, which "usurped ORT's opportunity to purchase 8 acres of the Agri-Sources property." The court also highlighted McChesney's actions in preventing the sale from occurring "and seeking to dispossess ORT of its place of business, consequently reaping the benefits of ORT's over $400,000 worth of improvements on the property." Accordingly, the court granted ORT's motion for a preliminary injunction, and HRS appealed.

¶ 29                                                          ANALYSIS

¶ 30 On appeal, HRS argues that the circuit court erred when it granted ORT's motion for a preliminary injunction.

¶ 31 A preliminary injunction is intended to preserve the status quo of the parties until the circuit court can decide the merits of a case. *Callis, Papa, Jackstadt & Halloran, P.C. v. Norfolk & Western Ry. Co.*, 195 Ill. 2d 356, 365 (2001). A preliminary injunction is "an extreme remedy which should be employed only in situations where an emergency exists and serious harm would result if the injunction is not issued." *Callis*, 195 Ill. 2d at 365. To obtain a preliminary injunction, a party must establish that: (1) it possesses a clearly ascertained right in need of protection; (2) it will suffer irreparable harm without the injunction; (3) its injury has no adequate remedy at law; and (4) it is likely to succeed on the merits of their case. *Callis*, 195 Ill. 2d at 365-66.

¶ 32 "On appeal, a reviewing court examines only whether the party seeking the injunction has demonstrated a *prima facie* case that there is a fair question as to the existence of the rights claimed." *Callis*, 195 Ill. 2d at 366; see also *Illinois Beta Chapter of Sigma Phi Epsilon Fraternity Alumni Board v. Illinois Institute of Technology*, 409 Ill. App. 3d 228, 231 (2011) (noting that neither controverted facts nor the merits of the case are to be decided and that "[t]he only question is whether there was a sufficient showing to affirm the order of the trial court"). A decision on a preliminary injunction is a matter within the circuit court's discretion, and we will not disturb that decision absent an abuse of that discretion. *Callis*,

195 Ill. 2d at 366.

¶ 33     I. WHETHER ORT POSSESSED A CLEARLY ASCERTAINED RIGHT
IN NEED OF PROTECTION

¶ 34     With regard to the first element of the preliminary injunction standard, the circuit court found that "ORT has established a prima facie case that there is a contractual right to obtain an ownership interest in the ORT/Agri-Sources Purchase Agreement of August 18, 2010, and that that right still exists." HRS does not challenge this finding on appeal and advances no argument that ORT lacked a clearly ascertained right in need of protection.

¶ 35     II. WHETHER ORT WOULD SUFFER IRREPARABLE HARM AND
WHETHER THERE WAS AN ADEQUATE REMEDY AT LAW

¶ 36     The second and third elements of the preliminary injunction standard are closely related. See *Hensley Construction, LLC v. Pulte Home Corp.*, 399 Ill. App. 3d 184, 190 (2010) ("[t]he second requirement for a preliminary injunction, irreparable harm, 'occurs only where the remedy at law is inadequate, meaning that monetary damages cannot adequately compensate the injury and the injury cannot be measured by pecuniary standards' " (quoting *Franz v. Calaco Development Corp.*, 322 Ill. App. 3d 941, 947 (2001))). With regard to these two elements, HRS argues that the circuit court erred when it found that ORT would suffer irreparable harm without the injunction and when it found that ORT had no adequate remedy at law. Specifically, HRS argues that monetary damages would be an appropriate and sufficient remedy. HRS's argument ignores long-standing case law.

¶ 37     "Where land is the subject matter of the agreement, the inadequacy of the legal remedy is well-settled." *Heritage Standard Bank & Trust Co. v. Steel City National Bank*, 234 Ill. App. 3d 48, 56 (1992); see *Giannini v. First National Bank of Des Plaines*, 136 Ill. App. 3d 971, 981 (1985). In this case, ORT entered into the Purchase Agreement with Agri-Sources to purchase the eight acres of the Agri-Sources Property on which ORT operated its fertilizer business. Cumulative to noting the fact that real estate was involved, the circuit court stated that the ORT Property was uniquely suited to ORT's fertilizer operation and that an interference with the Purchase Agreement would have extreme and incalculable ramifications on ORT's business relationships. In fact, ORT had already lost a customer due to this litigation; this customer constituted approximately 10% to 15% of ORT's business at the time. Another customer also testified that he would likely pull his business if ORT could not operate from its current facility, at least in part because of the improvements ORT made on the property allowed this customer to obtain a particular blend of fertilizer that he could not obtain from other businesses. Under these circumstances, we agree with the circuit court that ORT met its burden on the second and third elements of the preliminary injunction standard. Accordingly, we hold that the circuit court did not err when it found that the harm to ORT would be irreparable (see *Prentice Medical Corp. v. Todd*, 145 Ill. App. 3d 692, 701 (1986) (noting that the concept of irreparable injury contemplates matters such as "damage to the good will of a business which would be incalculable [citation] or loss of competitive position")) and when it found that ORT had no adequate remedy at law in the absence of the

injunction (see *Heritage Standard Bank*, 234 Ill. App. 3d at 56 ("[a]n ownership interest in property is a right for which injunctive protection may be granted")).

¶ 38       III. WHETHER ORT WAS LIKELY TO SUCCEED ON THE MERITS OF
ITS CLAIMS

¶ 39       With regard to the fourth element of the preliminary injunction standard, HRS argues that the circuit court erred when it found that ORT was likely to succeed on the merits of its specific performance and breach of fiduciary duty claims. HRS attacks both of these findings, and we will address these arguments in turn.

¶ 40              A. The Likelihood of ORT Succeeding on the Merits of Its
Specific Performance Claim

¶ 41       First, HRS argues that ORT could not succeed on its specific performance claim because the Agri-Sources mortgage was superior to ORT's contractual right to purchase the ORT Property and because corporate veil piercing does not apply. We believe HRS's arguments fail because they ask this court to adjudicate matters not proper for adjudication at this stage of the case.

¶ 42       The remedy of specific performance is not available as a matter of right, but rather is available as an equitable remedy that is based on "the desire to do more perfect and complete justice, which the remedy at law would fail to give." *Daniels v. Anderson*, 162 Ill. 2d 47, 56 (1994); see *Hagen v. Anderson*, 317 Ill. 173, 177 (1925) (*per curiam*) ("[c]ontracts to devise or convey real estate are enforced by specific performance on the ground that the law cannot do perfect justice"); see also *Dixon v. City of Monticello*, 223 Ill. App. 3d 549, 560-61 (1991) (noting that the remedy of specific performance is granted to prevent injustice and because "perfect justice cannot be done at law").

> "To state a cause of action for specific performance, the plaintiff must allege and prove the following elements: (1) the existence of a valid, binding and enforceable contract; (2) the compliance by plaintiff with the terms of his contract or the fact that he is ready, willing and able to perform his part of the contract; and (3) the failure or refusal by the defendant to perform his part of the contract." *McCormick Road Associates L.P. II v. Taub*, 276 Ill. App. 3d 780, 783 (1995).

Because this case was before the circuit court on a motion for preliminary injunction, ORT was not required to prove that it was entitled to relief on the merits of its specific performance claim. *People ex rel. Sherman v. Cryns*, 203 Ill. 2d 264, 277 (2003) ("[a] preliminary injunction is not intended to determine controverted rights or decide the merits of a case"). Rather, ORT only had to raise a fair question of its right to specific performance such that the status quo should have been preserved until the merits of the case could be decided. See *Buzz Barton & Associates, Inc. v. Giannone*, 108 Ill. 2d 373, 382 (1985). We also note that a reviewing court can sustain a circuit court's judgment on any basis that has a factual basis in the record. *Estate of Johnson v. Condell Memorial Hospital*, 119 Ill. 2d 496, 502 (1988).

¶ 43       In this case, the circuit court found that the evidence presented at the hearing raised fair questions that: (1) ORT had entered into the Purchase Agreement in August 2010 with Agri-Sources to purchase the eight acres of the Agri-Sources Property upon which ORT operated its business; (2) ORT had performed its end of the Purchase Agreement; and (3) the Purchase Agreement would have been consummated but for the actions of McChesney. Our review of the record reveals no error in these findings.

¶ 44       Further, HRS's argument that specific performance was impossible–due to the mortgage on the entire Agri-Sources Property–oversimplifies the issue and fails to recognize the interrelated nature of ORT's claims. Whether the Agri-Sources mortgage would defeat any right ORT had to buy the ORT Property is a matter to be determined when the case is decided on the merits and not when the case is on appeal from a ruling that granted a preliminary injunction. The determination of any effect the Agri-Sources mortgage would have necessarily depends on further examination of the propriety of McChesney's conduct in obtaining the Agri-Sources note for HRS. As our supreme court has noted, ethical principles must be carefully considered in cases involving specific performance. *Lucey v. Shelton*, 24 Ill. 2d 471, 475 (1962). Some of the considerations relevant to this issue have been referenced in ORT's pleadings, including the breach of fiduciary claim and statements related to the equitable doctrines of merger and unclean hands. See, *e.g.*, *Jurado v. Simos*, 166 Ill. App. 3d 380, 382 (1988) (noting that the equitable doctrine of merger can operate to cancel a debt if one individual is both the obligor and the obligee on the note). See also *Donk Bros. & Co. v. Alexander & Taussig*, 117 Ill. 330, 337 (1886) (discussing and applying merger); *Forthman v. Deters*, 206 Ill. 159, 171 (1903) (noting that equity will not prevent a merger if such a prevention would sanction a wrong such as fraud); *State Bank of Geneva v. Sorenson*, 167 Ill. App. 3d 674, 680 (1988) (discussing the equitable defense of "unclean hands" in the foreclosure context and stating that under the doctrine, "equitable relief may be denied if the party seeking that relief is guilty of misconduct, fraud, or bad faith toward the party against whom relief is sought, and further provided that the misconduct, fraud, or bad faith is in connection with the transaction under consideration"); Restatement (Third) of Restitution and Unjust Enrichment § 63 (2011) (discussing restitution in the context of the unclean hands doctrine); *Hofert v. Latorri*, 22 Ill. 2d 126, 130 (1961) (holding that once a fiduciary relationship has been established, if the dominant party profits from any transaction between the parties, a rebuttable presumption arises that the transaction is fraudulent); *Clark v. Clark*, 398 Ill. 592, 601 (1947) (same). See generally 26 Richard A. Lord, Williston on Contracts § 69:23, at 590 (4th ed. 2003) (stating that when a fiduciary relationship exists, "there is a positive duty to disclose materials facts, and a failure to do so is constructively fraudulent"); Restatement (Third) of Restitution and Unjust Enrichment § 43 (2011) (discussing restitution in the context of a breach of fiduciary duty). Discovery has not been performed in this case and the merits of all of the relevant claims have not been addressed, and the present appeal is neither the appropriate place nor the appropriate time to decide them.

¶ 45       Likewise, whether the corporate veil will be pierced in this case is a matter not appropriate for determination by this court. Given the evidence presented in this case regarding McChesney's actions to block the sale of the ORT Property and to obtain, through

HRS, the assignment of the Agri-Sources note from FSBI, we agree that ORT raised a fair question that the corporate veil could be pierced in this case. See *Gass v. Anna Hospital Corp.*, 392 Ill. App. 3d 179, 186 (2009) ("[a] party seeking to pierce the corporate veil must make a substantial showing that (1) there is such a unity of interest and ownership that the separate personalities of the corporations no longer exist and (2) circumstances exist so that adherence to the fiction of a separate corporate existence would sanction a fraud, promote injustice, or promote inequitable consequences"); see also *Westmeyer v. Flynn*, 382 Ill. App. 3d 952, 960 (2008) (citing section 10-10(d) of the Limited Liability Company Act (805 ILCS 180/10-10(d) (West 2008)) and stating that "while the Act provides specifically that the failure to observe the corporate formalities is not a ground for imposing personal liability on the members of a limited liability company, it does not bar the other bases for corporate veil piercing, such as alter ego, fraud or undercapitalization").

¶ 46    For the aforementioned reasons, we hold that the circuit court did not err when it ruled that ORT had shown it was likely to succeed on the merits of its specific performance claim.

¶ 47                    B. The Likelihood of ORT Succeeding on the Merits of Its
                              Breach of Fiduciary Duty Claim

¶ 48    Second, HRS argues that ORT could not succeed on its breach of fiduciary duty claim because McChesney was not a member of ORT and even if he was, he did not breach any of his fiduciary duties to ORT, which were defined by the 2010 Operating Agreement. Again, we believe that HRT's arguments fail because they ask this court to adjudicate matters not proper for adjudication at this stage of the case.

¶ 49    Prevailing on a claim for a breach of fiduciary duty requires the complainant to establish that: (1) a fiduciary duty existed; (2) the duty was breached; and (3) the breach proximately caused an injury to the complainant. *Neade v. Portes*, 193 Ill. 2d 433, 444 (2000). Section 15-3 of the Limited Liability Company Act defines general standards of conduct for members and managers of LLCs. 805 ILCS 180/15-3 (West 2010). Standards that differ slightly are enumerated for members of both member-managed and manager-managed LLCs. 805 ILCS 180/15-3(a)-(g) (West 2010). Members of member-managed LLCs owe duties of loyalty and care to the LLC and other members (805 ILCS 180/15-3(a) (West 2010)), which includes acting fairly with regard to the LLC's business (805 ILCS 180/15-3(b)(2) (West 2010)). Further, members of member-managed LLCs must discharge their duties to the LLC and other members with obligations of good faith and fair dealing. 805 ILCS 180/15-3(d) (West 2010). The members of manager-managed LLCs do not owe the same type of duties to the LLC or other members, but can owe the same type of duties if the member "exercises the managerial authority vested in a manager by [the] Act." 805 ILCS 180/15-3(g)(3) (West 2010).

¶ 50    As we stated above with regard to ORT's specific performance claim, ORT was not required to establish that it was entitled to judgment on the merits of its breach of fiduciary duty claim. See *Sherman*, 203 Ill. 2d at 277. At this stage of the case, ORT only had to raise a fair question of its right to recover on its breach of fiduciary duty claim. See *Buzz Barton*, 108 Ill. 2d at 382.

¶ 51    In this case, the circuit court first found that the evidence established ORT was an LLC, but the evidence was conflicting on whether ORT was a member-managed LLC or a manager-managed LLC at the time of the alleged breach of fiduciary duty. The court noted that after the new ORT Operating Agreement was signed in August 2010, both Ryan and McChesney engaged in acts and made statements that were consistent and inconsistent with ORT being a member-managed LLC or a manager-managed LLC. Additionally, ORT's original status as a member-managed LLC was never changed with the Secretary of State. The court's findings in this regard were not erroneous.

¶ 52    Second, the circuit court found that the evidence raised a fair question of whether McChesney was a member of ORT at the time of the alleged breach of fiduciary duty. In this regard, the court specifically mentioned the following factors:

"[1] McChesney was listed as a member of ORT in ORT's original articles of organization; [2] he was identified and signed the original Operating Agreement for ORT dated May 11, 2007; [3] he was identified and signed as a member of ORT relative to the August 16, 2010, ORT Operating Agreement; [4] he signed the August 19, 2010, ORT accounts payable report as a member; [5] he was listed as a member of ORT, albeit with a 0% profit/loss percentage in ORT's 2010 Schedule K-1; [6] he identified himself as a member of ORT in a June 3, 2011, e-mail in which he objected to the ORT purchase of the Agri-Source Property; and [7] there are judicial admissions (or mistakes of record) in which McChesney identifies himself as a *current* member of ORT as compared to a *former* member of ORT." (Emphases in original.)

Given this conflicting evidence, we agree with the circuit court that ORT raised a fair question of whether McChesney was a member of ORT at the time of the alleged breach. Because this case is on appeal from a grant of a preliminary injunction, we decline both parties' attempts on appeal at having us conclusively determine the issue.

¶ 53    Third, the circuit court found that the evidence raised a fair question of whether McChesney engaged in acts that constituted a breach of his fiduciary duties to ORT. As the court noted, ORT presented evidence sufficient to show that McChesney failed to fully disclose his personal matters that were adverse to ORT's business interests. In particular, a fair question was raised that McChesney, through HRS, obtained the Agri-Sources note at least in part to block the sale of the ORT Property–a sale that he objected to "as a member of ORT" via email from his attorney. Our review of the record reveals no errors in the court's findings on this matter.

¶ 54    "To establish a likelihood of success, [the movant] need only raise a fair question regarding the existence of a claimed right and a fair question that he will be entitled to the relief prayed for it the proof sustains the allegations." *Kalbfleisch v. Columbia Community Unit School District No. 4*, 396 Ill. App. 3d 1105, 1114 (2009). Under the circumstances of this case, we hold that the circuit court did not err when it found that ORT had established that it was likely to succeed on the merits of its breach of fiduciary duty claim.

¶ 55                                    CONCLUSION
¶ 56    For the foregoing reasons, the judgment of the circuit court of Henderson County that

granted ORT's motion for a preliminary injunction is affirmed.

¶ 57        Affirmed.