NOTICE

Decision filed 03/20/24. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2024 IL App (5th) 230274

NO. 5-23-0274

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

_____

| | | |
|---|---|---|
| RON & MARK WARD, LLC; RLW & MLW, LLC; WARD CHRYSLER CENTER, INC.; RONALD L. WARD; and MARK L. WARD, | ) ) ) ) | Appeal from the Circuit Court of Williamson County. |
| Plaintiffs-Appellees, | ) ) | |
| v. | ) ) | No. 21-MR-107 |
| BANK OF HERRIN, | ) ) | Honorable John William Sanders, |
| Defendant-Appellant. | ) ) | Judge, presiding. |

_____

JUSTICE WELCH delivered the judgment of the court, with opinion.
Justices Cates and McHaney concurred in the judgment and opinion.

**OPINION**

¶ 1    The defendant, Bank of Herrin (defendant or Bank), appeals from the order of the circuit court of Williamson County, granting the plaintiffs—Ron & Mark Ward, LLC, RLW & MLW, LLC, Ward Chrysler Center, Inc., Ron Ward, and Mark Ward—a preliminary injunction, which enjoined the defendant from pursuing its default remedies on certain loan documents executed by the plaintiffs. On appeal, the defendant contends that the trial court abused its discretion in granting the preliminary injunction where (1) the plaintiffs' request for injunctive relief in their third amended complaint was dismissed, (2) they had no clearly ascertainable right in need of protection because the loan matured on October 30, 2022, (3) they have suffered no irreparable harm because they had the financial ability to pay off the loan and await the outcome of the trial on the merits,

1

(4) they had an adequate remedy at law because they only requested money damages in their complaint, (5) they did not have a likelihood of success on the merits, and (6) the balance of equities favored the defendant. For the reasons that follow, we affirm.

¶ 2                                I. BACKGROUND

¶ 3     Ron Ward and Mark Ward owned and operated two car dealerships in Southern Illinois: a Chrysler dealership located in Carbondale, Illinois, and a Chevrolet dealership located in Metropolis, Illinois. The defendant was an Illinois state banking corporation with offices in Southern Illinois. From 2016 through 2018, the plaintiffs and the defendant entered into business loan agreements requiring the defendant to issue loan disbursements for the dealerships to purchase vehicles to sell. The vehicles were collateral for the loans.

¶ 4     In 2017, employees of the Chrysler dealership began double-booking loans with the defendant; the employees requested multiple loans for the same vehicle. Consequently, the defendant loaned money to them twice (or more) for the same vehicle. These double-booked loans were part of a scheme in which the employees sold new vehicles at a reduced rate, one-half of the price, in exchange for payments that were made under the table. Then, to cover the losses, the employees requested advances from the defendant under the business loan agreements entered into between the parties, even though those agreements only permitted Ron and Mark to authorize any monetary advances. The employees used this money to hide the losses that the dealerships were taking on the discounted sales. The plaintiffs discovered this scheme in December 2018. However, by then, the plaintiffs owed the defendant approximately $2.8 million for the double-booked loans.

¶ 5     In October 2020, the plaintiffs sought to refinance several loans that were held by the defendant. On October 30, 2020, as part of the refinancing, Ward Chrysler Center and RLW & MLW, LLC executed a promissory note pursuant to a loan from the defendant in the amount of

2

$2,573,874.45. Ron and Mark executed personal guarantees related to the note, and it was secured by, among other things, a blanket Uniform Commercial Code (UCC) (810 ILCS 5/1-101 *et seq.* (West 2020)) lien on the plaintiffs' business assets, a mortgage on Mark's home, and a mortgage on Ron's farm. The note had a maturity date of October 30, 2022.

¶ 6 On April 8, 2021, the plaintiffs initiated this suit by filing a five-count complaint against the defendant. The plaintiffs then filed a first amended complaint and a second amended complaint. On May 28, 2021, the trial court entered a docket entry, which stated that the defendant agreed it would not seek to enforce its UCC lien or foreclose on its mortgages without court order.

¶ 7 Thereafter, on August 16, 2022, the plaintiffs filed a third amended complaint, which brought the following causes of action against the defendant: breach of contract (count I), violation of the Consumer Fraud and Deceptive Business Practices Act (815 ILCS 505/1 *et seq.* (West 2020)) (count II), unjust enrichment (count III), negligent misrepresentation (count IV), declaratory judgment (count V), violation of the Racketeer Influenced and Corrupt Organizations Act (RICO) (18 U.S.C. § 1961 *et seq.* (2018)) (count VI), fraudulent inducement (count VII), breach of contract for a breach of the 2016 business loan agreement entered between the parties (count VIII), breach of contract for a breach of the 2017 change in terms agreement (count IX), breach of contract for a breach of the 2018 business loan agreement (count X), breach of contract for a breach of the 2018 dealer operating agreement (count XI), fraud for the double-booking scheme (count XII), unjust enrichment for the double-booking scheme (count XIII), and lender liability (count XIV). In the complaint, the plaintiffs acknowledged that the trial court had previously dismissed with prejudice counts I and II.

¶ 8 Regarding the double-booking scheme, the plaintiffs alleged that the defendant was aware of the scheme and knowingly issued loans for which it had no collateral. The plaintiffs contended

that, by June 2018 at the latest, a Bank director knowingly issued multiple loans for the same new vehicles and was aware that certain dealership employees recorded those new vehicles as being sold to generate the extra loans. Instead of revealing this information to the plaintiffs, the defendant made a conscious and deliberate decision to join the scheme. Specifically, the defendant backdated the double-booked loans, which allowed the double-booking and reduced sales to remain undetected. The defendant conducted monthly inventories of the vehicles at the dealerships and, by April 2017, became aware that certain vehicles were not physically present on the lots. The plaintiffs also recorded the vehicle information for each disbursement made, which included each vehicle's identification number.

¶ 9     The plaintiffs contended that the defendant was well aware that it was issuing double loans on up to 75 vehicles at any one time. However, the defendant never disclosed this information to the plaintiffs, even when the plaintiffs entered into new and subsequent loan agreements and guarantor agreements with the defendant. Instead, the defendant only discussed this information with two of the plaintiffs' clerical employees, both of whom were part of the scheme. Although the loan agreements only permitted two people, Ron and Mark, to authorize loans from the defendant, the defendant issued the double loans at the request of these employees.

¶ 10    The plaintiffs argued that the excess money from the double-booked loans was essential to the scheme because it allowed the dealerships to have enough cash on hand to cover the losses for the reduced vehicle sales. After Ron and Mark discovered the scheme, the defendant required them to personally pay more than $2.8 million to rectify the double-booked loans. The defendant also collected interest from the plaintiffs on those loans.

¶ 11    On September 15, 2022, the defendant filed a motion to dismiss the third amended complaint, along with a memorandum in support of the motion. In the motion, the defendant noted

4

that counts I through V of the third amended complaint were predicated on the defendant's conduct in 2020-21 and related to an exchange of e-mails between the plaintiffs' agents and the defendant's agents; the e-mails were exchanged in an effort to amend the various written loan agreements. Thus, the defendant contended that the Credit Agreements Act (Act) (815 ILCS 160/3 (West 2020)), which required that any amendment to a loan agreement be signed by both parties, controlled the validity of those five counts. The defendant argued that, since the plaintiffs failed to present the trial court with a document reflecting an agreement that was signed by both parties, those counts should be dismissed.

¶ 12    With regard to the remaining counts, the defendant contended that the plaintiffs failed to allege sufficient facts to sustain a RICO claim and the plaintiffs' factual allegations regarding the fraud claims failed to establish that the defendant obtained "operational control" over the car dealerships to the point of creating a fiduciary duty. The defendant also contended that the plaintiffs' unjust enrichment claims were based on the same allegations as made in a previously dismissed complaint and should be similarly dismissed. As for the lender liability count, the defendant argued that it could find no support for a lender liability cause of action and that this count should be dismissed because there was no fiduciary duty between the parties.

¶ 13    On October 21, 2022, before the refinanced loans matured, the plaintiffs filed a motion for a temporary restraining order (TRO) and preliminary injunction, seeking to enjoin the defendant from foreclosing on the collateral that secured the refinanced loans once the loans matured. The plaintiffs indicated that this collateral included the Ward Chrysler inventory and building, the inventory and assets of RLW & MLW, LLC, Mark's home, and Ron's farm. The plaintiffs contended that they would suffer permanent, irreparable harm if the defendant was allowed to pursue its default remedies under the loan agreement; they would lose a multigenerational

business, Mark would lose his home, and Ron would lose his farm. The plaintiffs also contended that they had protectable rights in their personal and business property and assets, and they had claims against the defendant that had survived a motion to dismiss.

¶ 14 The plaintiffs argued that a monetary damages award would not adequately protect their interests because it would not return their land or business. They argued that they had a strong likelihood of success on the merits, as the trial court's partial denial of the defendant's motion to dismiss demonstrated that they had at least raised a fair question as to their rights. They indicated that the defendant flagrantly breached its contract and, consequently, imposed millions of dollars of debt on them; the defendant defrauded them into agreeing to personal guarantees; and they should never have incurred the debt that the defendant claimed was owed. They also contended that the balance of harms favored entering a preliminary injunction as the harm to them absent an injunction would be substantial and permanent. However, if the defendant ultimately prevailed in the litigation, it could then pursue its default remedies. Attached to the motion were, among other things, (1) Mark's October 21, 2022, affidavit, in which he stated that the factual statements in the motion were true and correct, and (2) the October 30, 2020, promissory note evidencing the refinanced loans.

¶ 15 On October 26, 2022, the defendant filed a motion to continue the hearing on the motion for TRO and preliminary injunction. In the motion, the defendant agreed, without the entry of a TRO, not to initiate any collection action against the plaintiffs until after the hearing on the motion for preliminary injunction. On October 31, 2022, the defendant filed a response to the motion for preliminary injunction, in which it argued that the plaintiffs had failed to demonstrate a protectable interest as the relevant promissory notes had already matured.

6

¶ 16    In a November 15, 2022, docket entry, the trial court noted that count I of the third amended complaint was previously dismissed. On November 22, 2022, the court entered an order on the defendant's motion to dismiss, dismissing counts II through V of the third amended complaint because the Act barred the plaintiff from the relief sought in those counts. The court then noted that its rulings on the remaining counts remained as previously ordered; the plaintiffs were permitted to proceed on those counts with necessary amendments. On December 12, 2022, the court entered an order via docket entry, denying the defendant's motion to dismiss with regard to count XIV (lender liability), and found that the plaintiffs had alleged sufficient facts setting forth this cause of action.

¶ 17    On February 14, 2023, the plaintiffs filed a fourth amended complaint, which set forth the following causes of action that had not been previously dismissed: a violation of RICO (count I), breach of contract for breaching the 2016 business loan agreement (count II), breach of contract for breaching the 2017 change in terms agreement (count III), breach of contract for breaching the 2018 business loan agreement (count IV), breach of contract for breaching the 2018 dealer operating agreement (count V), and lender liability (count VI). These causes of action were based on the double-booking loan scheme. Essentially, the plaintiffs argued that the defendant breached the various loan agreements by issuing loans with no collateral and issuing loans that were not authorized by Mark or Ron.

¶ 18    At the February 27, 2023, hearing on the motion for preliminary injunction, the defendant's counsel agreed that the defendant would not seek to enforce its lien on the plaintiffs' assets until the trial court issued its decision on the request for preliminary injunction. After the court heard the parties' arguments on the preliminary injunction, it ordered them to submit affidavits in support of their positions in lieu of holding an evidentiary hearing. On March 1, 2023, the plaintiffs filed

7

a corrected fourth amended complaint, which set forth the same causes of action but made some corrections to the previous complaint.

¶ 19    On March 13, 2023, the defendant filed an affidavit from Jason Henson, the president of the Bank, in opposition to the plaintiffs' motion for preliminary injunction. According to the affidavit, the plaintiffs had two outstanding loans with the defendant: loan number 20, which had a payoff amount of $609,519.61 as of March 3, 2023 (the original principal amount was $614,000) and a maturity date of October 30, 2022, and loan number 30, which had a payoff amount of $2,259,905.15 as of March 3, 2023 (the original principal amount was $2,573,874.45) with a maturity date of October 30, 2022. Henson stated that, although these loans were secured by a mortgage on the Ward Chrysler dealership, based on the dealership's appraised value and the estimated amounts due to the other lienholders who also held mortgages on the dealership, he estimated that there was little to no equity for the defendant to foreclose on the property. However, Ron and Mark also executed personal guaranty agreements on the two loans. Ron granted the defendant a mortgage on certain real property, which was appraised at $347,000 on October 20, 2020, and Mark granted the defendant a mortgage on his home, which was appraised at $580,000 on September 28, 2011. Henson estimated that the total secured debt on the two properties was $691,705. He also indicated that the January 31, 2022, financial statement from Ward Chrysler Center showed a total net worth of $2,803,985.

¶ 20    That same day, the plaintiffs filed a supplemental memorandum in support of their motion for preliminary injunction. In the memorandum, the plaintiffs contended that it was within the trial court's inherent equitable authority to enter an injunction maintaining the status quo pending resolution of the parties' disputes, even if the plaintiffs were not seeking a permanent injunction. The plaintiffs observed that, although they no longer sought a permanent injunction to invalidate

8

the note, their remaining causes of action were directed to the heart of the debt reflected in the note and the debt obligation flowed entirely from the defendant's involvement in and enabling of the double-booked loan scheme. The plaintiffs argued that, as a result of this scheme, they owed approximately $2.7 million for loans made on vehicles that did not exist, and they could not pay these loans because the vehicles did not exist. Then, in October 2020, the defendant presented them with the option to either execute the note or default and lose their business. Thus, the obligation reflected in the note was a component of the damages that they incurred as a result of the defendant's conduct.

¶ 21 The plaintiffs argued that they had a clearly ascertainable right in need of protection. Specifically, Mark would lose his home, Ron would lose the family farm that had been in operation for 20 years, and a foreclosure on the UCC liens on their business assets would result in the loss of their franchise. Although the defendant argued that the trial court had no authority to alter the terms of a matured contract, the plaintiffs countered that the defendant had provided no case law to support that position. The plaintiffs also pointed out that this litigation began before the note's maturity, and the question whether they would be required to pay the debt had been at issue since shortly after the note was executed. They indicated that their claims had survived multiple rounds of motions to dismiss and reconsideration, and the trial court found that their complaint stated several valid and plausible causes of action against the defendant.

¶ 22 The plaintiffs contended that the defendant's argument that they would face no irreparable harm because they were able to pay off the loan ignored the reality that, because of the defendant's conduct, they had depleted their personal wealth and mortgaged their property and business "to the hilt." They indicated that the only reason they executed the note was because they had nowhere else to turn; there were no other lenders and no more personal savings. Therefore, they argued that,

9

if a preliminary injunction was not issued, they would lose their property and their livelihood, and no money judgment would compensate for those losses.

¶ 23 The plaintiffs argued that the issuance of a preliminary injunction was necessary to preserve the status quo. They noted that all of the collateral securing the loan still existed and could not be disposed of because of the liens, and the defendant was presently charging default interest on the note. The plaintiffs indicated that, if they were successful in the underlying lawsuit, their damages would be offset by the loan amount and the accrued default interest; and if the defendant won, it would be entitled to collect on the note. The plaintiffs argued that, either way, the defendant would receive what it bargained for when it extended the loan in October 2020.

¶ 24 Attached to the memorandum was Mark's March 13, 2023, affidavit, in which he indicated that the loan refinance was necessary due to the double-booked loans scheme. He indicated that the loans were not authorized by himself or Ron, and they were in violation of their floor-plan financing agreements with the defendant. Because of these loans, the plaintiffs' employees were able to continue selling vehicles at a discounted rate for more than two years. Mark indicated that he initially discovered the problem with the inventory in December 2018, when he was informed about missing cars from the used car lots, cars for which they had borrowed money to purchase but were no longer present to sell to pay back the borrowed money. He indicated that, when he first learned of the issue, he did not know that the missing vehicles were the result of vehicles having been double floor-planned and that the defendant's unauthorized loans were essential to the scheme. Instead, his primary concern was making sure that their relationship with the defendant was secure.

¶ 25 Mark indicated that, when he initially asked the defendant what they needed to do about the missing vehicles, the defendant's director informed him that the defendant required a payment

10

of $1.5 million to cover the loans on the missing cars. Therefore, he and Ron used their personal funds to make that payment in December 2018. Throughout 2019, he continued to investigate the issue and ultimately learned that the missing vehicles were not actually missing but had never existed in the first place. He also learned that the $1.5 million that they paid was only a small portion of the amount of money that had been loaned to them as part of the scheme. As a result of the investigation, which included retaining a forensic accountant, they determined that approximately 480-500 vehicles were double floor-planned.

¶ 26    Mark stated that, throughout 2019, they were in a constant struggle to have a positive cash flow because they were required to make loan payments on vehicles that did not exist. Consequently, he and Ron paid an additional $2.3 million of their personal funds into the business to remain solvent and keep current on their obligations to various creditors. Their cash flow issues continued into and throughout 2020.

¶ 27    Mark also stated that, although the defendant was only supposed to provide floor-plan financing for used vehicles, they discovered that up to 10% of the vehicles involved in the scheme were new vehicles. The defendant knew at the time it made those loans that the vehicles were new because it used factory invoices to support their values.

¶ 28    Mark noted that, in December 2019, he and Ron met with the Bank's president and demanded that the debt be wiped clean. However, the defendant refused. In August or September 2020, the defendant told Mark that it would not renew the floor-plan financing and that the plaintiffs needed to make payments in full. However, the defendant was never able to provide a consistent amount of what was owed. On October 30, 2020, the defendant ultimately presented them with a "take it or leave it" offer to enter into a new promissory note for $2,569,665.45. With no other recourse, and to avoid default and the loss of their business, they signed the promissory

11

note. They later discovered that, even though the defendant had agreed to release its UCC filings on the business assets, the promissory note included a blanket UCC lien on those assets as part of its collateral. As additional collateral, the defendant demanded that they provide a first-lien mortgage on Ron's farm and a junior mortgage on Mark's home. Mark indicated that Ron's farm was a working family farm that provided employment for numerous family members. Also, Mark and his family had resided in their home for 15 years, and his children were raised there.

¶ 29 Mark stated that the promissory note matured on October 30, 2022, and the defendant expressed its intention to initiate foreclosure proceedings on the collateral, which would be devastating for him, Ron, and their families. Although the UCC liens on the business assets were not first-position liens, the defendant's foreclosure would cause them to default on their floor-plan financing and their franchise agreement with Chrysler, which could not be recovered.

¶ 30 On March 20, 2023, the defendant filed a response to the plaintiff's supplemental memorandum, which argued that the plaintiffs were barred from requesting injunctive relief because their fourth amended complaint contained no such request. The defendant contended that the plaintiff's motion for preliminary injunction was predicated on the e-mail agreements between the parties, but the causes of action that were based on those agreements were dismissed. Thus, the defendant argued that the request for preliminary injunction should be similarly dismissed.

¶ 31 In the alternative, the defendant contended that the plaintiffs did not establish the essential elements for a preliminary injunction. Specifically, the defendant argued that the plaintiffs had no clearly ascertainable right in need of protection since the loans matured on October 30, 2022; they were effectively seeking a mandatory injunction requiring the defendant to enter into a new loan agreement extending their already-matured loans; and the status quo that should be preserved was that the loans were mature, and the plaintiffs were obligated to pay the loans. The defendant argued

that the relevant case law indicated that injunctive relief was only available when a contract between the parties was still in effect (executory), which was not the case here as there was no valid, enforceable contract that was currently in effect (since the loan had already matured).

¶ 32    The defendant also contended that the plaintiffs had suffered no harm where they had the financial ability to pay off the debt without suffering irreparable harm. The defendant indicated that the plaintiffs, through Mark's affidavit, had misrepresented their financial ability to pay the debt. The defendant also indicated that Mark's affidavit was comprised of conclusory allegations and opinions, not statements of fact, and did not provide any support for the allegation that they were unable to pay the debt and await the outcome of the trial on the merits.

¶ 33    The defendant then noted that its attached affidavit evidenced the plaintiffs' financial ability to pay off the loan. Specifically, the defendant noted that the plaintiffs' January 2022 dealer financial statement revealed the total net worth of Ward Chrysler Center was $2,803,985. Further, the combined net worth of the plaintiffs totaled $19 million. Thus, the defendant argued that the plaintiffs could not, in good faith, allege that their failure to obtain injunctive relief would put them out of business. The defendant also argued that the plaintiffs had an adequate remedy at law where they were seeking monetary damages, not equitable relief. The defendant further argued that the plaintiffs did not have a likelihood of success on the merits where they did not have a legal right to require the defendant to extend the note beyond the maturity date and that they had no ability to establish irreparable harm based on their considerable financial resources.

¶ 34    Lastly, the defendant contended that the balance of equities favored denying injunctive relief where it would resurrect expired loan agreements and force the defendant to enter into a new loan agreement that would presumably continue until the underlying litigation was resolved. The

13

defendant noted that, in the meantime, it would lose contractually accrued interest and the ability to minimize the loss of its principal.

¶ 35 At the April 3, 2023, hearing, the trial court made the following findings about the preliminary injunction request. The court refused to accept the defendant's argument that the plaintiffs were unable to obtain a preliminary injunction because they did not request injunctive relief in their fourth amended complaint. The court noted that, even though the plaintiffs' request for injunctive relief in their third amended complaint was ultimately dismissed, they had filed a motion requesting a preliminary injunction. The court found that, as a court of general jurisdiction, it could consider this motion, even without a request for injunctive relief in the underlying complaint. The court then found that the status quo of this case was when the lawsuit was filed; at that time, there was a viable contract that had not yet matured; and the controversy arose before the maturity of the promissory note. Thus, the court also did not accept the defendant's argument that the status quo was an unenforceable contract that had matured. Instead, the court found that the last actual peaceable, uncontested status that preceded the pending controversy was the existence of a viable, enforceable contract. The court then took the decision whether to grant or deny the preliminary injunction under advisement. That same day, the trial court entered an order, via docket entry, denying the defendant's motion to dismiss the plaintiffs' fourth amended complaint, reiterating its findings about the preliminary injunction, and noting that the request for injunctive relief was still under advisement.

¶ 36 On April 12, 2023, the trial court entered an order, granting the plaintiffs' motion for preliminary injunction. In the order, the court noted that the defendant agreed not to enforce its contract with the plaintiffs until a decision was made on the preliminary injunction, and the parties agreed that the preliminary injunction hearing would be by argument rather than witness testimony

14

since one of the plaintiffs was unable to attend due to illness. The court then stated that it accepted the plaintiffs' argument that they were not required to pray for injunctive relief in their complaint to be successful with their motion for injunctive relief. The court noted that the plaintiffs brought a motion for injunctive relief, even though their underlying complaint no longer contained such a request, and the court, as a court of general jurisdiction, could consider that motion.

¶ 37    The trial court then found unpersuasive the defendant's argument that the status quo was one in which there was no existing, enforceable contract because the debt obligation had matured. The court noted that *Gold v. Ziff Communications Co.*, 196 Ill. App. 3d 425, 431 (1989), explained that the status that was sought to be preserved was the last known, peaceful position prior to the controversy. The court here found that the position of the parties before any controversy and at the time of the alleged controversy was an existing enforceable contract. The court noted that the plaintiffs filed their complaint and motion seeking injunctive relief before the maturity of the promissory note. Thus, the court found that the status quo that was to be preserved was the position the parties had prior to the maturity of the loan agreement in question.

¶ 38    The trial court then found that the plaintiffs possessed a protectable right in the alleged breach of the loan agreements, which the defendant had not sought to dismiss; the alleged RICO violations; and the claimed liability due to the defendant's alleged control over the plaintiffs' employees. The court also found that there was a sufficient likelihood of success on the merits where the plaintiffs had sufficiently raised an issue as to whether the defendant properly acted under the terms of the loan agreements by entering into loans with unauthorized persons, as well as sufficiently raised issues regarding actions taken by the defendant's employees.

¶ 39    The trial court further found that there would be irreparable injury absent injunctive relief where the plaintiffs, as part of the refinanced loans, agreed to pledge their homes and certain

15

business assets as collateral. The court noted that the defendant intended to proceed in enforcing its liens on the plaintiffs' assets, which would include foreclosing on the plaintiffs' homes and certain inventory of the plaintiffs' business. The court then noted that it was well settled law that real estate was unique, and once a home was foreclosed upon, the owner lost the right to peacefully enjoy that asset, especially a residence the owner possessed for a considerable time period. Further, the court noted that the enforcement of the UCC liens could severely damage the plaintiffs' ability to conduct their longtime business.

¶ 40 As for whether there was an adequate remedy at law, the trial court admitted that it struggled with this element since the plaintiffs were seeking monetary relief and, therefore, there was a relief at law for them. However, the court noted that the question was whether that relief was adequate. The court stated that it was concerned whether—given the extent of potential harm absent an injunction, *i.e.*, the loss of one or two of the plaintiffs' residences and the possible cessation of a longtime business—that remedy was adequate. Moreover, the court noted that it was reasonably concerned that, even if successful, it could be quite some time before the plaintiffs would receive the remedies awarded to them, given the length of time already expended for this litigation to progress. Therefore, although the court noted that a remedy at law existed, it concluded that the remedy was not sufficiently adequate.

¶ 41 Regarding balancing the equities, the trial court found that the hardships the plaintiffs would incur absent an injunction would be much harsher than the hardships the defendant would incur if granted. The court noted the harm caused to the plaintiffs could be irreparable, whereas, if they were unsuccessful in their lawsuit, they would still be bound by the terms of the loan agreements and susceptible to the default remedies under those agreements. In contrast, the overriding hardship the defendant would incur if the injunction was granted was time lost in its

16

ability to enforce the parties' agreement. Thus, based on the above, the court granted the preliminary injunction. The defendant subsequently filed a notice of interlocutory appeal pursuant to Illinois Supreme Court Rule 307(a)(1) (eff. Nov. 1, 2017).

¶ 42                                    II. ANALYSIS

¶ 43    On appeal, the defendant contends that the trial court erred in granting the preliminary injunction where (1) the plaintiffs had no clearly ascertainable right in need of protection, (2) they suffered no irreparable harm, (3) they had an adequate remedy at law, (4) they did not have a likelihood of success on the merits, and (5) a balancing of the equities favored the defendant.

¶ 44    A preliminary injunction preserves the status quo until the merits of the case are decided. *Clinton Landfill, Inc. v. Mahomet Valley Water Authority*, 406 Ill. App. 3d 374, 378 (2010). This is an extraordinary remedy that is applicable only in extreme emergency situations or where serious harm would result if it was not issued. *Id.* To obtain a preliminary injunction, the moving party must demonstrate (1) a clear, ascertainable right in need of protection, (2) irreparable injury in the absence of an injunction, (3) no adequate remedy at law, and (4) a likelihood of success on the merits of the case. *City of Kankakee v. Department of Revenue*, 2013 IL App (3d) 120599, ¶ 17. "The trial court may also deny a preliminary injunction where the balance of hardships does not favor the moving party." *Clinton Landfill, Inc.*, 406 Ill. App. 3d at 378. The moving party must raise a fair question as to each element required to obtain the injunction. *Id.*

¶ 45    Generally, an abuse of discretion standard of review applies to the trial court's decision to grant or deny a preliminary injunction. *Smith v. Department of Natural Resources*, 2015 IL App (5th) 140583, ¶ 22. A trial court abuses its discretion where its ruling is arbitrary, fanciful, or unreasonable or where no reasonable person would adopt the court's view. *Id.* However, where

17

the trial court does not make any factual findings and, instead, rules on a question of law, the standard of review is *de novo*. *Id.* ¶ 23.

¶ 46　　　　　　　　　A. Clear, Ascertainable Right in Need of Protection

¶ 47　The defendant first contends that the plaintiffs had no clearly ascertainable right in need of protection where their request for injunctive relief in their complaint was dismissed. Specifically, the defendant argues that count V of the plaintiffs' third amended complaint, which requested injunctive relief, and motion for preliminary injunction were predicated on e-mail agreements between the parties. However, the counts in the complaint based on those e-mail agreements were ultimately dismissed by the trial court. Because the plaintiffs' fourth amended complaint failed to request injunctive relief, and the allegations in the motion for preliminary injunction were entirely based on the e-mail agreements, the defendant contends that the plaintiffs no longer had a protectable interest sufficient to grant preliminary injunctive relief.

¶ 48　In granting the preliminary injunction, the trial court accepted the plaintiffs' argument that they were not required to pray for injunctive relief in their complaint in order to obtain such relief. As a court of general jurisdiction, the court could consider their motion for injunctive relief, even though their underlying complaint no longer requested that relief. In support of this decision, the court relied on *In re Marriage of Schweihs*, 222 Ill. App. 3d 887 (1991), and *In re Marriage of Elliott*, 265 Ill. App. 3d 912 (1994). In *Schweihs*, 222 Ill. App. 3d at 895, the appellate court concluded that the trial court was authorized to enjoin a bank from initiating foreclosure proceedings on marital property in any other court, other than the court hearing the dissolution action. There, the request for preliminary injunction was raised in a motion. *Id.* at 889-90.

¶ 49　Here, although we recognize that the plaintiff did not make a request for injunctive relief in their fourth amended complaint, they did file a motion requesting that relief. A request for TRO

18

or preliminary injunction may be included in the original complaint or it may be requested by motion filed at the same time or later and supported by proper affidavits. *Kolstad v. Rankin*, 179 Ill. App. 3d 1022, 1029 (1989). Thus, we find that the plaintiffs here properly requested injunctive relief in their motion, even though they did not request such relief in their fourth amended complaint.

¶ 50    In making this decision, we note that the defendant seems to agree with this conclusion in its arguments made on appeal. In its appellate briefs, the defendant acknowledges that the trial court has jurisdiction and the power to enter preliminary injunctive relief in this matter. However, the defendant argues that the trial court has wrongly conflated jurisdiction to enter a preliminary injunction with the pleading and proof requirements to establish preliminary injunctive relief. The defendant then argues that the plaintiffs failed to plead facts establishing a protectable interest in need of injunctive relief where the motion relied on the dismissed allegations concerning the e-mail agreements. Thus, the question is whether the plaintiffs' motion for preliminary injunction pled sufficient facts to establish a protectable interest.

¶ 51    After carefully reviewing the plaintiffs' motion for preliminary injunction, we disagree with the defendant's contention that the motion was entirely based on the e-mail agreements. Although the facts concerning those e-mails were discussed in the motion, the plaintiffs also alleged facts supporting its claims surrounding the double-booking loan scheme. Specifically, the plaintiffs set forth facts about how the scheme worked; the defendant's alleged part in the scheme; the execution of the October 30, 2020, promissory note that was secured by certain real estate, including Mark's home and Ron's family farm; the loan maturing on October 30, 2022; the plaintiffs' anticipation that the defendant would initiate collection proceedings on the collateral;

19

and the permanent, irreparable harm they would suffer if the defendant was allowed to pursue its default remedies.

¶ 52 As for the plaintiffs' arguments to each of the preliminary injunction elements, the plaintiffs argued that they had protectable rights in their personal and business property and assets; they had claims against the defendant that had already survived dismissal, which included claims that were based on the double-booking scheme; they would suffer permanent harm as Mark would lose his family home, Ron would lose the family farm, and they would have to close down their dealerships; and an award of damages would not adequately protect their interests as a monetary award would not return their land or business. They further argued that they had a strong likelihood of success on the merits as demonstrated by the trial court's partial denial of the defendant's motion to dismiss. They contended that the defendant flagrantly breached the loan agreements and imposed millions of dollars of debt on them, and they were defrauded into agreeing to execute personal guarantees.

¶ 53 Lastly, the plaintiffs argued that the balance of harm favored entering the preliminary injunction, as their harm would be substantial and permanent and would include the loss of home, land, and business. However, there would be no irreparable harm to the defendant if prevented from foreclosing on the collateral during the course of the litigation. If the defendant ultimately prevailed, it could then pursue its default remedies. Thus, based on the above, we conclude that the plaintiffs' motion for preliminary injunction was not entirely based on the e-mail agreements, and it alleged sufficient facts to set forth the elements for injunctive relief.

¶ 54 The defendant next contends that the plaintiffs failed to establish a clearly ascertainable right because the loan agreements were fully executed as they matured on October 30, 2022. The defendant argues that the plaintiffs are effectively seeking a mandatory injunction, requiring the

20

defendant to enter into a new loan agreement extending the maturity date until the completion of the litigation. In support of this position, the defendant cites *S&F Corp. v. American Express Co.*, 60 Ill. App. 3d 824, 830 (1978), in which the appellate court held that the trial court erred in granting a mandatory injunction requiring a party to continue performing under a contract that contained a valid at-will termination provision. Specifically, the court concluded that, since the contract contained a valid termination provision, the party seeking the injunctive relief did not establish a clear right to the relief sought. *Id.* Moreover, the court found that the preliminary injunction did not preserve the status quo; instead, it altered the status quo by requiring the parties to continue with the contract until further court order. *Id.* Similarly, the defendant here argues that the plaintiffs have no protectable right to insist on an extension of the loan agreements where the loans had already matured.

¶ 55    In response, the plaintiffs contend that the defendant's argument is without merit since their motion for preliminary injunction was filed before the loan matured, and the defendant essentially consented to the entry of a TRO prior to the maturity of the loan. Thus, the plaintiffs argue that the last, peaceable status of the parties prior to the filing of the motion was that of an unmatured promissory note with no basis upon which it could be enforced by the defendant.

¶ 56    Also, the plaintiffs deny that they are requesting a mandatory injunction and instead argue that their request and the court's order was wholly prohibitory—specifically, to prohibit enforcement of the promissory note. The plaintiffs indicate that they did not request that the note be cancelled, that the maturity date be changed, or that the interest not accrue by the higher default rate. Thus, they argue that, unlike in *S&F Corp.*, the trial court here did not mandate that the defendant continue performing under the parties' agreement; it simply prohibited the defendant from enforcing a promissory note during the parties' litigation. The plaintiffs also argue that they

21

do have a clearly ascertainable right in need of protection as they risk the loss of Mark's home, Ron's family farm, and their businesses.

¶ 57 The purpose of a preliminary injunction is to preserve the status quo in property or rights at issue until a final hearing on the merits can be held. *Gold*, 196 Ill. App. 3d at 431. Status quo is defined as the last, actual, peaceable, uncontested status that preceded the pending controversy. *Id.* A mandatory preliminary injunction does not preserve but alters the status quo. *Halvorsen v. Richter*, 37 Ill. App. 3d 344, 346 (1976). In general, a mandatory preliminary injunction is not favored; the only justification for such relief is to maintain the status quo where necessary to prevent irreparable injury. *Gold*, 196 Ill. App. 3d at 431. Thus, the court must find that there exists great necessity for a mandatory preliminary injunction, and the need for such relief must be free from doubt to justify it. *Id.* Usually, the status quo is maintained by keeping everything at rest and in its present condition. *Id.* at 432. However, sometimes the status quo is not a condition of rest but of action because the condition of rest will inflict irreparable injury on the party seeking injunctive relief. *Id.*

¶ 58 In this case, the trial court found that the position of the parties at the time of the controversy, and before the controversy, was an existing, enforceable contract. The court noted that the plaintiffs filed their complaint against the defendant and their motion for injunctive relief before the maturity of the note. Thus, the court found that the status quo that was to be preserved was the position the parties had prior to the maturity of the loan agreement in question.

¶ 59 We agree with the trial court that the last, actual, peaceable, uncontested status that preceded the pending controversy was that of an unmatured note. Also, even though the note matured in October 2022, during the pendency of these proceedings, we note that the defendant agreed to not pursue its default remedies until the court ruled on the preliminary injunction request.

22

Thus, the issuance of a preliminary injunction prohibiting the defendant from pursuing any default remedies until the litigation was resolved preserved the status quo by keeping everything at rest and in that condition to prevent irreparable harm, *i.e.*, the foreclosure of the plaintiffs' properties. The preliminary injunction did not mandate that the defendant continue performing under the parties' agreement. Instead, it simply prohibited the defendant from enforcing the note while the litigation was ongoing to prevent the defendant from foreclosing on the plaintiffs' property during this time.

¶ 60   Moreover, the trial court found, and we agree, that the plaintiffs did possess a protectable right, that being an alleged breach of the loan agreements, which the defendant has not sought to dismiss; the alleged RICO violations; and the claimed liability due to the defendant's alleged control over the plaintiffs' employees (even though the defendant disagrees with the viability of these causes of actions). Also, the plaintiffs have established a clearly ascertainable right in their personal and business property and assets that need protection. Thus, we find that the trial court properly determined that the plaintiffs have demonstrated an ascertainable right in need of protection.

¶ 61           B. Irreparable Harm and Adequate Remedy at Law

¶ 62   The second and third elements for a preliminary injunction are closely related. *Happy R Securities, LLC v. Agri-Sources, LLC*, 2013 IL App (3d) 120509, ¶ 36. An alleged injury is defined as irreparable when it is of such nature that the injured party cannot be adequately compensated with monetary damages and damages cannot be measured by pecuniary standards. *Id.* The mere existence of a remedy at law, or the fact that a monetary judgment may be the ultimate relief, does not deprive the trial court of its power to grant injunctive relief if that remedy is inadequate. *K.F.K. Corp. v. American Continental Homes, Inc.*, 31 Ill. App. 3d 1017, 1021 (1975). An adequate

23

remedy at law is one that is "clear, complete, and as practical and efficient to the ends of justice and its prompt administration as the equitable remedy." *Id.* The trial court must look at the entire record to determine if irreparable harm would occur absent a preliminary injunction. *Gold*, 196 Ill. App. 3d at 434. "Where the only remedy sought at trial is damages, the two requirements— irreparable harm, and no adequate remedy at law—merge. The question is then whether the plaintiff will be made whole if he prevails on the merits and is awarded damages." *Roland Machinery Co. v. Dresser Industries, Inc.*, 749 F.2d 380, 386 (7th Cir. 1984).

¶ 63    In arguing that the plaintiffs here have failed to establish irreparable harm and no adequate remedy at law, the defendant relies on *Kanter & Eisenberg v. Madison Associates*, 116 Ill. 2d 506 (1987). There, the trial court granted a law firm tenant's request for a preliminary injunction, restraining its landlord from filing an eviction action during the pendency of the underlying proceedings where the firm challenged the additional rental amounts that the landlord claimed were owed. *Id.* at 508-09. On appeal, the supreme court concluded that the firm failed to establish irreparable harm and an inadequate remedy at law where it was financially able to pay the disputed rent and then proceed with its action for damages in the underlying lawsuit. *Id.* at 514-15. In fact, the firm actually paid the demanded amount in dispute with a portion of the second payment being escrowed pursuant to the trial court's order. *Id.* at 515.

¶ 64    The defendant here contends that, like in *Kanter*, the plaintiffs had the financial ability to pay off the loan and await the outcome of the trial on the merits. Specifically, the defendant notes that Henson's affidavit outlined the plaintiffs' considerable financial ability and undermined their claim that they would suffer irreparable harm of being put out of business if the defendant collected on the indebtedness. For instance, the defendant noted that the plaintiffs' 2022 dealer financial statement revealed that the total net worth of the Ward Chrysler Center was $2,803,985. Further,

24

the defendant noted that the combined net worth of Ron and Mark exceeded $19 million. Thus, the defendant contends that the plaintiffs cannot, in good faith, allege that their failure to obtain injunctive relief will put them out of business. Moreover, the defendant argues that Mark's affidavit did not contain any financial information that would demonstrate that they were financially unable to pay off the indebtedness.

¶ 65 In response, the plaintiffs argue that their financial worth is almost entirely tied up in the business, their homes, and Ron's farming operation with virtually no liquid assets, much less $2.7 million to pay off the promissory note. The plaintiffs contend that, because of the defendant's conduct, they have depleted their personal wealth and mortgaged their property and their businesses "to the hilt," and they were forced to execute the promissory note with the defendant because they had no personal savings to pay off the debt.

¶ 66 In applying the deferential abuse of discretion standard applicable to our review, we conclude that the trial court did not err in finding that the plaintiffs raised a fair question as to the second and third elements for a preliminary injunction. After evaluating the parties' written submissions, which included Henson's and Mark's affidavits, and the defendant's arguments and comparison to *Kanter*, the court concluded that the plaintiffs had demonstrated irreparable harm and no adequate legal remedy.

¶ 67 In finding that there was irreparable injury, the trial court noted that, as part of the refinanced loan, the plaintiffs agreed to pledge their homes as well as certain business assets as collateral and that the defendant had expressed its intent to enforce the liens on those assets. The court noted that it was well settled that real estate was unique, and once a home was foreclosed upon, the owner lost the right to peacefully enjoy that asset. Further, the court noted that the

25

enforcement of the UCC liens could irreparably damage the plaintiffs' ability to adequately conduct its longtime business.

¶ 68    As for whether the plaintiffs had an adequate remedy at law, the trial court acknowledged that the plaintiffs were seeking monetary relief and, therefore, had a remedy at law. However, the court noted that the question was whether that remedy was adequate. Given the extent of the potential harm absent an injunction (*i.e.*, the loss of one or two of the plaintiffs' residences and possible cessation of a longtime business), the court determined that remedy was inadequate. Also, the court noted that, even if successful, it could be some time before the plaintiffs could receive the remedies awarded to them, given the length of time already expanded for the underlying litigation to progress. Thus, the court found that, although there existed a remedy at law, the remedy was not sufficiently adequate. After carefully reviewing the record and the relevant case law, we find that the court did not abuse its discretion in finding irreparable harm and no adequate remedy at law.

¶ 69                    C. Likelihood of Success on the Merits

¶ 70    The defendant contends that the plaintiffs clearly have no ability to establish a likelihood of success on the merits because they cannot establish the other elements required for the issuance of a preliminary injunction. In response, the plaintiffs note that they need only raise a fair question as to their likelihood of success on the merits. They argue that they have satisfied this standard as demonstrated by the fact that they have alleged six causes of action that have survived "incessant pleadings motion practice" and the defendant did not challenge the validity of their contract claims at the pleading stage.

¶ 71    First, we find the defendant's argument that the plaintiffs cannot establish a likelihood of success on the merits because they did not establish the other preliminary injunction requirements

26

unpersuasive. To show a likelihood of success on the merits, a party must raise a fair question as to the existence of the right claimed. *Abdulhafedh v. Secretary of State*, 161 Ill. App. 3d 413, 417 (1987). For this requirement, we look at whether the plaintiff will likely be entitled to the relief requested in the underlying complaint, not whether the plaintiff has satisfied the other requirements for a preliminary injunction. Second, as explained above, we have concluded that the plaintiffs here have established the other requirements for the issuance of a preliminary injunction.

¶ 72    Turning to the issue of whether the plaintiffs raised a fair question as to the existence of the right claimed, we note that, in finding that this element has been met, the trial court indicated that there had been considerable argument by the parties as to the RICO action and whether the defendant could be liable for the asserted claim of control over certain employees of the plaintiffs. However, the court found that the plaintiffs sufficiently raised an issue as to whether the defendant properly acted under the terms of the loan agreement by entering into loans with unauthorized persons, as well as sufficiently raised issues regarding actions taken by the defendant's employees. After carefully reviewing the record, which reveals unsuccessful attempts by the defendant to dismiss some of the plaintiffs' remaining causes of action, we find that the record supports the trial court's conclusion that the plaintiffs have a likelihood of success on the merits. Thus, we conclude that the court's decision that the plaintiffs raised a fair question as to the likelihood of success on the merits on the plaintiffs' remaining causes of action set forth in their fourth amended complaint was not an abuse of discretion.

¶ 73                                    D. Balance of Equities

¶ 74    The defendant contends that it is not equitable to reward the plaintiffs with a preliminary injunction when they have the ability to pay their indebtedness and await the outcome of the trial on their purely legal claims for monetary damages. The defendant also contends that enjoining it

27

from collecting on the loans during the course of the litigation would impose undue hardship, whether from the changes in the market value of the collateral or changes to the plaintiffs' business. The defendant noted that it was losing the contractually accruing interest on the loan agreements, as well as the opportunity to stop the accrual of that interest, and the opportunity to minimize the loss of its principal.

¶ 75 Once the trial court establishes the requirements for a preliminary injunction, the court must then balance the equities to determine the relative inconvenience to the parties and whether the burden on defendant should the injunction issue outweighs the burden on the plaintiff should it be denied. *Franz v. Calaco Development Corp.*, 322 Ill. App. 3d 941, 946 (2001). In balancing the hardships, the trial court here found that the hardships the plaintiffs would incur absent an injunction would be much harsher than the hardships on the defendant if the injunction were granted. The court noted that the plaintiffs would suffer irreparable harm if the defendant was permitted to foreclose on their homes and business assets, whereas, if the plaintiffs were unsuccessful with their lawsuit, they would still be bound by the terms of the loan agreements and susceptible to the defendant's default remedies, which included an increase in the balance on the loan's interest provisions and the enforcement of the liens pledged as collateral. In contrast, the hardship incurred by the defendant if the injunction were granted would be time lost in its ability to enforce the loan agreements. As we conclude that the trial court's decision was supported by the record, we find that its decision on the balancing of the equities was not an abuse of discretion.

¶ 76                                    III. CONCLUSION

¶ 77 For the foregoing reasons, we affirm the judgment of the circuit court of Williamson County.

¶ 78 Affirmed.

28

*Ron & Mark Ward, LLC v. Bank of Herrin*, 2024 IL App (5th) 230274

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Williamson County, No. 21-MR-107; the Hon. John William Sanders, Judge, presiding. |
| **Attorneys for Appellant:** | Mark S. Johnson, of Johnson, Schneider & Ferrell, LLC, of Cape Girardeau, Missouri, for appellant. |
| **Attorneys for Appellee:** | Dan Twetten, of Loevy & Loevy, of Boulder, Colorado, Thomas M. Hanson, of Loevy & Loevy, of Grapevine, Texas, and Brian E. McGovern and W. Chris Jarvis, of McCarty, Leonard & Kaemmerer, L.C., of Town & Country, Missouri, for appellees. |