FALCON, LTD., et al., Plaintiffs-Appellees, v. CORR'S NATURAL BEVERAGES, INC. a/k/a R. J. Corr Naturals, Inc., et al., Defendants-Appellants.

First District (1st Division)   No. 87—0925

Opinion filed December 31, 1987.

Hamman & Benn, of Chicago (George W. Hamman, Marvin N. Benn, and Wayne H. Michaels, of counsel), for appellants.

Neistein, Richman, Hauslinger & Young, Ltd., of Chicago (Michael P. Siavelis and William R. Klein, of counsel), for appellees.

JUSTICE BUCKLEY delivered the opinion of the court:

Falcon, Ltd., an Illinois corporation, and its president Thomas Paulus (plaintiffs), filed a three-count complaint against Corr's Natural Beverages, Inc., also an Illinois corporation, and its chairman and chief executive officer Robert Corr (defendants), seeking to recover damages and to enjoin defendants' breach of a distributorship agreement that gave plaintiffs the exclusive right and license to sell and distribute through wholesale distributors certain nonalcoholic beverages on a commission basis, throughout the State of Illinois, and to enjoin defendants' tortious interference with plaintiffs' contractual and prospective relationships with its subdistributors. Defendants appeal from the trial court's order granting plaintiffs' subsequent motion for a preliminary injunction. For the reasons set forth below, we affirm.

The distributorship agreement entered into by the parties in September 1985 provides, *inter alia*:

"1.9 Corr's agrees and warrants that during the existence of this Agreement:

(a) It shall supply MASTER DISTRIBUTOR with a quantity of Beverages sufficient to meet the reasonable requirements under the price and terms agreed to by Corr's and Master Distributor at the time of sale and from time to time thereafter agreed to.

(b) It will not sell, deliver, ship, consign or distribute in any manner other than as provided herein to any person, corporation, firm, partnership or entity for sale, resale or use within the Territory other than to MASTER DISTRIBUTOR.

(c) It will promptly forward to MASTER DISTRIBUTOR all inquiries it receives for the sale or purchase of the Beverages in the aforesaid Territory for MASTER DISTRIBUTOR'S sale, response, handling and delivery.

\* \* \*

2.1(a) MASTER DISTRIBUTOR hereby agrees to Sell the Beverages as provided in this Agreement and may, as a Master Distributor, delegate the Sale of the Beverage by appointing wholesale distributors. \*\*\* Corr's will grant MASTER DISTRIBUTOR the right to partition off the Territory to various wholesale distributors at its discretion \*\*\*."

While the above agreement has no termination date, paragraph 5.3 lists the causes for which defendants could terminate the agreement. Paragraph 5.3(f) of the agreement provides that if plaintiffs vi-

olate the provisions of paragraph 5.3 or are in default in any other manner, defendants could terminate the agreement 60 days after receipt by plaintiffs of written notice of the breach. During this period, plaintiffs have the right to cure.

In a letter dated August 28, 1986, defendants notified plaintiffs that they considered them to be in breach of the agreement and that they intended to terminate the agreement 60 days after plaintiffs' receipt of the letter. Defendants subsequently agreed to stay termination of the contract until October 31, 1986, pending negotiations between the parties.

On October 26, 1986, plaintiffs filed their complaint for injunctive and other relief against defendants and, the following day, moved for a temporary restraining order and preliminary injunction. On October 24, 1986, a temporary restraining order was issued, and on January 23, 1987, the trial court held an evidentiary hearing on the preliminary injunction motion.

Gary Repezza, defendants' vice-president of sales, Dennis Weinhold, defendants' national sales and marketing director, and Thomas Paulus attested to the following at the hearing. Pursuant to the September 1985 distributorship agreement, plaintiffs entered into separate agreements with several wholesale subdistributors whereby the wholesale subdistributors agreed to sell and distribute defendants' beverages within a specified territory. In particular, plaintiffs established a "store/door delivery program" using their beer subdistributors, which facilitated defendants' entry into the beverage market in all Chicago area Jewel stores, an arrangement which defendants were unable to obtain prior to their distributorship agreement with plaintiffs.

Shortly thereafter, defendants attempted to sell their beverages to Dominicks, but Dominicks declined the offer based on plaintiffs' current beer subdistribution network. Dominicks agreed to accept defendants' proposal only if Kehe Foods (Kehe), an existing Dominicks supplier, would deliver the product. Consequently, in March 1986, plaintiffs agreed to transfer the delivery of beverages to Jewel from their beer subdistributors to Kehe in exchange for Kehe's agreement to deliver defendants' beverages to Dominicks. As a result, plaintiffs lost many of their beer subdistributors.

During this time, defendants entered into a new commission agreement with plaintiffs whereby plaintiffs were to receive $1 on chocolate and ginseng flavored beverages and $.61 on all other flavors, as opposed to the original $.25 commission per case. A memo dated March 27, 1986, sent from Weinhold to Robert Corr memorial-

ized this arrangement. In May or June 1986, defendants became dissatisfied with this pricing system because plaintiffs were making too much money. Robert Corr himself admitted that he was unhappy with the new commissions.

Therefore, in June, July, and August 1986, defendants contacted plaintiffs' subdistributors and instructed them to place their orders for beverages directly with defendants and not with plaintiffs, and further instructed that defendants would sell, deliver and invoice all beverages directly to them. Defendants sold approximately 25,000 cases of beverages to plaintiffs' subdistributors during this period. When Paulus learned of these actions, he called Dennis Weinhold, and stated, "You are violating the contract. Either cease or we are going to end up in court."

Robert Corr testified, however, that at a meeting on July 28 or 29, 1986, plaintiffs authorized defendants to directly invoice and ship to plaintiffs' subdistributors in order to alleviate some of plaintiffs' financial responsibility. While Paulus received a letter dated July 28 informing him of defendants' intention to sell beverages directly to plaintiffs' subdistributors, it contained no confirmation of plaintiffs' consent. Subsequent to that meeting, defendants billed certain Falcon subdistributors directly while giving plaintiffs $.25 a case on credit. Corr admitted on cross-examination, however, that he had been directly billing City Sales, Inc., one of plaintiffs' subdistributors which conducted wholesale business in Illinois as well as in Indiana, as early as May 30, 1986.

After hearing all of the evidence, the trial court issued a preliminary injunction against defendants which enjoined them from terminating the agreement, from directly or indirectly soliciting, accepting or filling orders for beverages with plaintiffs' subdistributors or any other distributors except plaintiffs, from interfering, or conspiring to interfere, with plaintiffs' existing and prospective relationships with its distributors, from reducing plaintiffs' commissions of $1 per case on chocolate and ginseng flavored beverages and $.61 per case on other flavors, and from engaging in any conduct which interferes with plaintiffs' rights under the agreement. It is from this ruling that defendants now appeal.

■ At the outset, we note that a preliminary injunction is a provisional remedy that a court grants before hearing a case on its merits to preserve the status quo. (*Hydroaire, Inc. v. Sager* (1981), 98 Ill. App. 3d 758, 424 N.E.2d 719.) Status quo is defined as "the last, peaceable uncontested status which preceded the litigation." (*The Instrumentalist Co. v. Band, Inc.* (1985), 134 Ill. App. 3d 884, 890-91,

480 N.E.2d 1273, 1278.) Generally, a party seeking injunctive relief must show that: (1) it possesses a clearly ascertainable right which needs protection; (2) it will be irreparably injured if the injunction is not granted; (3) it has no adequate remedy at law; and (4) it is likely to succeed on the merits. *Witter v. Buchanan* (1985), 132 Ill. App. 3d 273, 476 N.E.2d 1123.

■ The issuance or denial of a preliminary injunction is addressed to the trial court's sound discretion. Thus, a reviewing court will not disturb the findings of the trial court unless they are against the manifest weight of the evidence. (*Junkunc v. S. J. Advanced Technology & Manufacturing Corp.* (1986), 149 Ill. App. 3d 114, 498 N.E.2d 1179.) Here, defendants contend that the trial court's finding that plaintiffs established a probability of success on the merits was against the manifest weight of the evidence, as plaintiffs themselves materially breached the distributorship agreement, an issue on which the trial court excluded evidence. This argument is without merit.

■ As noted by this court in *Dolan v. United Cable Television Corp.* (1981), 96 Ill. App. 3d 734, 422 N.E.2d 15, affirmative defenses may not properly be resolved at a preliminary hearing, but rather at a final hearing on the merits; the reason being that the purpose of a preliminary injunction is to preserve the status quo pending the disposition of the case on the merits and not to decide the ultimate issues of the case. Thus, while evidence of plaintiffs' alleged breach of the agreement here may be considered at a hearing on the merits, it is not relevant to the present proceeding. In fact, those cases relied on by defendants to support their position involve final decisions on the merits as opposed to preliminary relief. (*Montes v. Hawkins* (1984), 126 Ill. App. 3d 419, 466 N.E.2d 1271 (summary judgment in specific performance action); *Spancrete of Illinois, Inc. v. Brickman* (1979), 69 Ill. App. 3d 571, 388 N.E.2d 47 (summary judgment in breach of contract action); *George F. Mueller & Sons, Inc. v. Northern Illinois Gas Co.* (1975), 32 Ill. App. 3d 249, 336 N.E.2d 185 (final judgment in breach of contract action).) Furthermore, the record contradicts defendants' assertion that the trial court excluded all evidence with respect to any alleged defaults by plaintiffs.

■ We next address defendants' contention that "[t]his case is essentially an action for breach of contract," and therefore money damages would provide plaintiffs with an adequate legal remedy. While immediate damages in loss of commissions may be calculable, the injury to plaintiffs' reputation and good will, and the resulting loss of existing and future business, is incalculable. (See *U-Haul Co.*

*v. Hindahl* (1980), 90 Ill. App. 3d 572, 413 N.E.2d 187.) The record indicates that plaintiffs spent substantial time and effort in developing a distribution network through which defendants could sell their beverages. In turn, defendants did not only directly bill plaintiffs' subdistributors as they claim, but they also received and filled orders without plaintiffs' consent in breach of the parties' distributorship agreement. In so doing, defendants interfered with plaintiffs' contractual and prospective relationships with their subdistributors to the extent that damages cannot be ascertained with any certainty. Accordingly, we find no abuse of discretion in the court's conclusion that plaintiffs had sufficiently shown the lack of an adequate remedy at law.

■ Defendants also maintain that plaintiffs have failed to establish the irreparable injury necessary for injunctive relief. An injury is "irreparable" when it is of such a nature that the injured party cannot be adequately compensated in damages or when damages cannot be measured by any pecuniary standard. (*Cross Word Products, Inc. v. Suter* (1981), 97 Ill. App. 3d 282, 422 N.E.2d 953.) The loss of sales and customers as well as the threat of continuation of such losses to a legitimate business interest, as alleged by plaintiffs in the present case, have been held sufficient to constitute irreparable injury. (*Eagle Books, Inc. v. Jones* (1985), 130 Ill. App. 3d 407, 474 N.E.2d 444; *U-Haul Co. v. Hindahl* (1980), 90 Ill. App. 3d 572, 413 N.E.2d 187.) Therefore, injunctive relief was warranted.

■ Equally unavailing is defendants' contention that the trial court altered the status quo by ordering defendants to pay commissions of $1 on chocolate and ginseng beverages and $.61 on other flavors as opposed to the $.25 commission listed in the agreement. Defendants admitted that they had agreed to these commission rates in March 1986, and these rates were in effect in May 1986, when the last, uncontested status between the parties existed. All of the witnesses, including defendants' own officers, testified that defendants and plaintiffs had negotiated for a new rate which could allow plaintiffs more than $.25 per case.

■ Defendants incorrectly state that the trial court could not enforce the new rates to which they had agreed because these rates were never reduced to writing. Defendants ignore the April 14, 1986, letter of their own national sales and marketing director and his memo of March 27, 1986, which refer to the new rates. Moreover, under Illinois law, parties to a written contract may alter or modify its terms by a subsequent oral agreement even though, as in the present case, the contract itself precludes oral modification. *Estate of*

*Kern v. Handelsman* (1983), 115 Ill. App. 3d 789, 450 N.E.2d 1286.

We finally turn to defendants' argument that the trial court disturbed the status quo by staying arbitration proceedings. Paragraph 3.2 of the distributorship agreement states that between August 1 and September 30 of each year, the parties would meet to agree on performance criteria for the total number of beverages that plaintiffs had to sell in the territory and would submit to binding arbitration if they could not agree. Paragraph 3.2 states, however, that there would be no performance criteria for the first year. Thus, in May 1986, when the last uncontested status existed, defendants had no right to seek arbitration since it was still within the first year of the agreement.

■ With respect to the issue of the injunction bond, section 11—103 of the Illinois Code of Civil Procedure provides that it is within the discretion of the court. (Ill. Rev. Stat. 1985, ch. 110, par. 11—103.) Defendants offered no evidence at the hearing to support the notion that a bond was required. Rather, plaintiffs conducted business with defendants for approximately one year and, during that period, never failed to pay for their purchases. In fact, as required by the distributorship agreement, Paulus had already obtained a $100,000 line of credit from First National Bank of Skokie, pledging his personal residence as collateral, to secure the payment of beverages purchased from defendants. Therefore, the trial court properly exercised its discretion in denying bond.

For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

CAMPBELL and O'CONNOR, JJ., concur.