2025 IL App (1st) 241466-U

SECOND DIVISION
May 13, 2025

No. 1-24-1466

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| ESTATE OF SARA J. ("SALLY") BREDEMANN, and FRANK MCCABE as Trustee of the JOSEPH J. BREDEMANN FAMILY TRUST, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| JOHN BREDEMANN and JOSEPH BREDEMANN IV, | ) ) | |
| Defendants, | ) ) | Appeal from the Circuit Court of Cook County |
| MARTIN J. BREDEMANN and KATHLEEN MCDONNELL BREDEMANN, as Trustee, for the MARTIN MEACHAM TRUST, the MARTIN TRUST, and the MJB TRUST, | ) ) ) ) | 18CH8937 |
| Intervenor-Plaintiffs-Appellees, | ) ) | Honorable Allen Price Walker, |
| v. | ) ) | Judge Presiding |
| JOHN BREDEMANN; JOSEPH BREDEMANN IV; FIRST FAMILY INC.; SECOND FAMILY, INC.; DEMPSTER DEVELOPMENT L.P.; DEMPSTER MANAGEMENT INC.; ADELPHI ENTERPRISES L.P.; ADELPHI DEVELOPMENT LLC; ADELPHI MANAGEMENT CORPORATION; FRATERNAL ENTERPRISES L.P.; FRATERNAL DEVELOPMENT LLC; FRATERNAL MANAGEMENT; CORPORATION, and THIRD FAMILY DEVELOPMENT LLC, | ) ) ) ) ) ) ) ) ) ) | |
| Defendants-Appellants. | ) ) | |

JUSTICE McBRIDE delivered the judgment of the court.
Justices Howse and Ellis concurred in the judgment.

**O R D E R**

¶ 1    *Held*: Remanded for clarification of the record and reasons for preliminary injunction, where the court rejected certain arguments but granted relief and declined to consider or permit discovery into five of the movant's six bases for relief.

¶ 2    Martin Bredemann obtained a preliminary injunction that prevents his older brothers, Joseph J. Bredemann, IV and John Bredemann, from ousting him on unfavorable terms from most of a family business of car dealerships that the siblings inherited. According to Martin, his brothers wanted to buy out his interests for an unreasonably low amount and when he declined, he was fired and told that not being employed at a dealership triggered an involuntary buyout without any compensation for the business' goodwill or "blue sky" value. Martin wants to remain an owner and has contended that his brothers have misappropriated, mismanaged and wasted assets; withheld information; and misrepresented the organization's fair market value. In this interlocutory appeal, some of the Bredemann entities contend that the injunction is too broad and in a separate brief, Joseph, John and other Bredemann entities add that injunctive relief is unwarranted because Martin can be compensated by money.

¶ 3    The litigants' father, Joseph J. Bredemann, III, was a third-generation car dealer who built a successful group of dealerships in Glenview and Park Ridge, Illinois, including Bredemann Chevrolet, Bredemann Ford, Bredemann Lexus, and Bredemann Toyota. We will refer to him as "Joe Senior" and to his wife, Sara J. Bredemann, as "Sally." The growth of the dealerships was due in part to the involvement of four of the couple's six children: the three litigants, their sister Mary Ann, as well as her husband, Steve Travnik. Through various trusts, Joe Senior gave the four siblings some of the business during his lifetime and when he died in 2014, his estate plan

transferred almost the entirety of the remaining business to them. The siblings' holdings are complicated because Joe Senior set up many trusts, partnerships, and corporations. Martin and Mary Ann have similar personal trusts that were funded with similar business assets. Martin's three trusts (MJB, Martin, and Martin Meacham) owned 26% of Lexus, 25% of Ford, 24.5% of the Ford real estate, 24% of Toyota, 23.5% of the Toyota and Chevrolet real estate, and 25% of the detail center's real estate. However, Joseph was given extra shares of the Lexus and Ford dealerships when he helped acquire them; John joined the business after trusts were set up for his siblings; and Mary Ann was not employed in the business but receiving income due to her husband's involvement. Adding to the complications described above is that Joe Senior gave Joseph the greatest management authority and nominated John to be the successor general manager of the Toyota dealership. Thus, Joseph and John's roles and holdings were slightly different from Martin and Mary Ann's, but the record does not disclose their details.

¶ 4     Joe Senior retained control of the overall business during his lifetime, in part by keeping the voting stock of the Chevrolet and Toyota dealerships in his own trust. Sally was a beneficiary of that trust. During Joe Senior's later years, the family tried, unsuccessfully, to negotiate a fair division. They contemplated for instance, that rather than continuing to share the assets "horizontally," the business could be split up "vertically," so that each sibling owned and operated a separate dealership. Martin wanted the Lexus dealership where he had worked for more than 20 years. After Joe Senior's death, however, Joseph sold the Lexus dealership and the trustees transferred the Toyota voting stock to John. These two events essentially gave control of the business to Joseph and John and exacerbated the disagreement they were having with Martin and their mother Sally about how to structure and own the business after Joe Senior died.

¶ 5    Sally sued Joseph and John in 2018, on behalf of herself and her deceased husband's trust. She alleged that her two sons had schemed to take control of the entire family business and force out their siblings (and brother-in-law) at below market value. In her amended complaint, she alleged that Joseph had operational control over the detail center, the Ford dealership, and the Lexus dealership, and that Joseph and John then tricked her into relinquishing the real estate and the Chevrolet and Toyota voting stock to John for no consideration. The car manufacturers required living, permanent dealer principals and Sally further alleged that her sons falsely represented that Toyota would revoke its franchise license if a redesignation was not made quickly and that John also had to take *temporary* custody of the Toyota voting stock in order to reassure Toyota that he was "ready to take charge and be 'answerable to the manufacturer.' " Sally alleged that John further falsely represented that he would return the Toyota voting stock to her as soon as the risk of losing the franchise had passed, or even earlier if she asked, but he subsequently refused to give the stock back. Significant in this appeal is the undisputed fact that the various Bredemann shareholder and partnership agreements have clauses that force the involuntary liquidation of trust-held shares at below market value in the event that "no beneficiary or spouse of a beneficiary is employed by the Partnership or its Affiliates in a full-time senior management position." The record indicates that Martin and Mary Ann's shares were trust-held, Martin had worked at Bredemann Lexus for at least 20 years and been its general manager for about 15, and Mary Ann's husband, Travnik, was employed as a long term sales manager/consultant at Bredemann Ford. Sally further alleged that shortly after John took complete operational control over the family business, he demanded that Martin and Mary Ann sell all of their interests at below-market value, and said that if they refused, then they would be receiving even less than that when he fired Martin

and Travnik in order to trigger the involuntary liquidation language. Sally sought return of her shares and damages, based on claims of fraud, breach of a contract to return the voting stock, breach of fiduciary duty, aiding and abetting breach of fiduciary duty, and an alternative claim of unjust enrichment. Sally died during the litigation and her claims are now being handled by her estate. Her action is not at issue in this interlocutory appeal.

¶ 6    This appeal arises from Martin's intervening suit, first filed in January 2019. Martin alleged that during the family's unfruitful negotiations to restructure the business and despite his repeated requests to buy the Lexus dealership, Joseph secretly put Lexus up for sale, found a third-party buyer, and scheduled the closing. The broker was instructed not to reveal anything to Martin and the bidders were told that he would be fired as part of the sale. Someone else told Martin about Joseph's secret plan just days before the closing and Martin took steps to protect his interests. On November 12, 2019, Martin wrote to Joseph and John asking to be employed in a senior management role at the Chevrolet, Ford or Toyota dealerships "effective upon the closing of the Lexus sale." On November 13, 2019, Martin appointed his brother-in-law, Travnik, as a beneficiary of the three trusts that hold Martin's interests in the Bredemann companies: the Martin Trust, the MJB Trust, and Martin Meacham Trust. That same day, Martin was hired by another brother, Thomas Bredemann, to work at another Bredemann entity, B-Team Remedies Limited Partnership (B-Team). Thomas was not a car dealer, but was the general partner of B-Team, which had a peripheral role in the family enterprise. Martin and his trusts, whom we are referring to collectively as Martin, sought an injunction to prevent the sale of the Lexus dealership, but the circuit court denied the request. Joseph and John did not directly respond to Martin's request to be transferred to another store. Joseph informed Martin in writing on November 15, 2019, that his

employment at Bredemann Lexus was ending on November 17, 2019, because the sale was closing the next day. According to Martin, the dealership's entire staff of 120 people was fired, but only three of them were actually left jobless when they were either not rehired by the buyer or transferred within the Bredemann enterprise. Those three were Martin, his son Andrew, and a person whom the buyer had previously employed and refused to rehire. As an equity holder, the Martin Trust received approximately $10 million from the sale of Bredemann Lexus.

¶ 7    While Sally and Martin's suits were pending, on February 28, 2020, counsel for some of the Bredemann entities wrote to Martin, stating that the sale of Bredemann Lexus and termination of Martin's employment had triggered his involuntary withdrawal from the remaining Bredemann entities. The letter indicated that the buyout of his interests would begin the next day and conclude in six weeks. The letter to Martin cited section 8.4 of the limited partnership and operating agreements and section 2.1 of shareholder agreements. Each of these governing documents contains substantially the same language which we will refer to as section 8.4:

"A Trust [Partner/Member/Shareholder] shall be deemed to have given a notification of withdrawal if at any time no beneficiary or spouse of a beneficiary is employed by the [Partnership/Company] or its Affiliates in a full time senior management position. Further, as used herein and solely with respect to Stephen Travnik, 'full time senior position' shall include the full time sales position held by Stephen Travnik in the Bredemann business on July 24, 2002, which position would not otherwise qualify as a full time senior management position but for this sentence."

¶ 8    Martin's attorney wrote back, disputing that Martin had withdrawn and demanding access to the books and records.

¶ 9    Martin filed a second amended complaint on March 10, 2020 that consists of 35 counts, the gist of which is to prevent the termination of his employment, halt the redemption of his ownership, and obtain financial disclosures and an accounting. Martin's direct claims mirror his mother's claim that Joseph and John demanded that Martin and Mary Ann either sell their interests in the family business for less than its real value or be forced out and that after Martin refused, they began forcing him out. Martin's derivative claims indicate that Joseph and John have engaged in oppressive conduct and waste by (a) hoarding cash in the business to impose financial duress, (b) manipulating the dealerships' financial statements, (c) usurping corporate assets by paying themselves without informing the other partners/siblings and using employees and vendors paid by the business to do maintenance and repair work on their homes and those of their children, (d) paying themselves excessive compensation while reducing payments to the other family members, and (e) commingling assets and funds among the entities in breach of the governing documents.

¶ 10    Martin and his mother jointly sought a temporary restraining order (TRO) to halt the redemption and liquidation of his remaining equity interests. The TRO was granted and led to the preliminary injunction order that is now on appeal. Martin emphasizes that his motion for TRO raised six different grounds, but the judge (at the time, Circuit Court Judge Franklin Ulyses Valderrama) addressed only the first of those six arguments when granting the TRO on March 13, 2020. We will set out the five latter arguments as relevant below. Martin's first argument was essentially that his actions just before being fired from Bredemann Lexus circumvented section 8.4. Martin's first ground was "(1) that the force out was contrary to the terms of the governing documents because his employment on behalf of his trusts and B-Team Remedies are full-time positions with the Bredemann Companies or their Affiliates, and because Stephen Travnik is a

beneficiary in all of Martin's trusts and he is employed full-time at Bredemann Ford." In granting the TRO on the basis of Martin's first argument, the court found there was a fair question as to whether Martin was a full-time employee and president of B-Team, and also a fair question as to whether Travnik was a beneficiary of the three Martin trusts and employed by a Bredemann dealership. The court did not discuss the five other potential grounds for a TRO and emphasized, "Today's ruling is limited to whether or not a fair question has been presented on the issues discussed." The court also specified "that it [was] not making any factual findings or otherwise indicating how it might rule on any issue in the future." The court then "crafted its own [language] rather than accepting the language proposed by [the] movants" and enjoined the defendants "from taking any action to liquidate the ownership interests of the Martin Bredemann Trusts in the Bredemann Companies."

¶ 11     On September 25, 2020, Martin requested a hearing on the preliminary injunction. He and his mother filed a joint brief which included all six grounds, but "focus[ed]" on the single ground that the court addressed in the TRO. The parties' discovery in 2020 and 2021 and the preliminary injunction hearings in 2022 and 2023 were limited by court order to the two fair questions specified in the TRO.

¶ 12     The circuit court heard testimony from Martin, Thomas, Joseph, and attorney Steven J. Katz, and read the deposition of CPA Jerald Rothchild.

¶ 13     Martin testified that he worked for his dad during high school and college and "officially" joined the family business in 1986, two years after college, when he began selling used Toyotas and Buicks. When the Lexus car line was introduced, he began selling them out of a trailer while the showroom was under construction, grew into the general sales manager role, and then, with

Joseph's endorsement, became the general manager of record in 2004. Martin did not specify the region but testified that under his management, Bredemann Lexus was one of the top Lexus dealers for 23 consecutive years.

¶ 14     While the family was discussing swapping their ownership interests (at fair market value) after Joe Senior's death, John got control of the voting stock of the Park Ridge entities, Joseph demoted Martin from the general manager position, and then, as of early 2015, Joseph began threatening to exclude the "blue sky" (good will) value from the reorganization. Joseph also refused to allow Martin to attend "Lexus meetings," withheld performance reports, cut off his ability to write checks and hire staff, reduced his compensation and stopped making distributions, and threatened to stop supporting B-Team and fire Martin altogether. Martin did not know the Lexus dealership was even up for sale until he got an e-mail less than an hour before the entire staff was informed that the dealership had been sold. Martin expressed interest in continuing to work for the Bredemann organization, and when he did not receive a positive response, he was hired at B-Team.

¶ 15     In Martin's written employment agreement with B-Team, his salary amount was left blank, for the time being, because the organization "had been drained of all its funds" and Thomas could not commit to a salary without knowing whether he would have the money. Martin's intention for B-Team was to generate sufficient investment income to pay the life insurance premiums for the policies that B-Team held on the siblings. Accordingly, Thomas issued capital calls in January 2020 and April, but Joseph and John ignored them. After that, Joseph and John's trusts sued to expel Thomas and he counterclaimed to enforce the capital calls. (The record indicates that the litigation about B-Team led to its dissolution.)

¶ 16    Martin further testified that he knew his father to be "fair" with his children and Martin did not think that the governing documents that were being used against him accurately reflected Joe Senior's intentions.

¶ 17    Thomas testified that his full-time job was in real estate. He had also been the general partner of B-Team since 1999, for which he had never been compensated. B-Team paid insurance premiums and an annual registration fee to the State of Illinois. Martin's base salary at B-Team was not specified in the written contract because the organization was "being starved" of money and lacked the capital to pay a salary.

¶ 18    Rothchild testified in a deposition that Bredemann Buick became his accounting client in 1964, and that, as the business grew into additional dealerships, partnerships, and corporations, he handled those accounts, as well as the many trusts that were created for individual family members, until Rothchild's retirement in 2008. He and Frank McCabe were successor co-trustees for Joe Senior and Sally's trusts and the co-trustees for the children's trusts. In order to avoid a conflict of interest when dealing with the various trusts, Rothchild refused any action that would favor one beneficiary over another, unless the beneficiaries agreed.

¶ 19    Rothchild was questioned about why he transferred the voting stock to John. The Toyota voting stock was the only significant asset that was still in Joe Senior's own trust when he died, and on paper, the trust went to Sally. However, the trust agreement authorized Rothchild to transfer the voting stock to a successor; Joe Senior wanted him to make the transfer; they talked many times about whether it should go to Joseph or John, and Joe Senior ultimately decided on John. After Joe Senior's death on February 20, 2014, Toyota was contractually entitled to notice of any heir's intent to succeed as the owner and to evaluate and approve any proposed ownership changes.

It is unclear from the record whether the notice deadline was 60 or 90 days; however, Rothchild was asked about a series of events which indicated that there was no real urgency to transfer the voting stock after Joe Senior's death. For instance, Bill Kelly, an attorney at the law firm Burke, Warren, who specialized in dealerships, e-mailed the family on February 25, 2014, advising them to request an extension, which Toyota would generally grant up to one year, so the family could sell, wind down, or otherwise resolve ownership of the Toyota and Chevrolet dealerships. In a letter dated April 2, 2014, Toyota wrote that John was listed as the successor general manager and that Toyota was entitled to evaluate and approve any documents that would transfer ownership from Joe Senior to John. In May, Toyota added 60 days to its deadline and again requested any trust and financial documents that would accomplish the change in ownership. Rothchild had been inclined to transfer the voting stock to John immediately after Joe Senior died (consistent with Joe Senior's wishes). However, since the family intended to restructure the entire business and Toyota was being patient, Rothchild decided to wait for a consensus on restructuring so that the Toyota stock would be transferred once instead of twice. When Joseph said in May or June that Toyota was becoming impatient, Rothchild called Toyota himself and was told that as long as the family was actively negotiating, Toyota would wait "a reasonable period of time." Next, John agreed to "take the owner/operator title until it's resolved" and the family voted him in as temporary head. Attorney Steve Katz drafted the proposal which provided that the stock would be transferred to John for no consideration. Toyota responded on July 15th with a list of documents that it wanted to evaluate. When the family met at North Shore Country Club on October 7th, Rothchild had been given the false impression that Toyota had approved John, so Rothchild thought it best to placate Toyota with a temporary transfer to John while still negotiating the restructuring. Someone

proposed that John commit in writing that he would return the stock when asked, and John then verbally committed to doing that. However, what John wrote the next day, October 8th, was only that he would return the stock if there was a "unanimous" agreement. John's letter "seemed okay" to Rothchild at the time, so he and McCabe executed the voting stock transfer.

¶ 20    Rothchild thought that John would notify Toyota right away, since "supposedly [Toyota] was getting frustrated and saying 'time is of the essence.' " However, John said nothing to Toyota until December 10th, and in a letter dated January 16, 2015, Toyota indicated that its approved status was that the stock was still in the Joe Senior trust. Toyota also wrote that the "above unauthorized change in ownership constitutes a material breach of Bredemann Toyota's Toyota dealership agreement." No one told Rothchild that it was a breach and he never would have executed the transfer had he known. Toyota "would be upset" and "would not be happy" if it had seen John's one-sentence letter to the family on October 8th indicating that the transfer was conditioned on a commitment that he would reverse it. John did not mention that the stock transfer was a breach when he e-mailed Rothchild and McCabe as trustees on February 6, 2016, cc'ing Joseph, stating that "Toyota has obviously become frustrated by our lack of progress regarding the *** formal succession." When John responded to Toyota's letter, he misstated that the stock transfer on October 8th had been for the family's "internal reasons." In Toyota's letter to John nearly three years later on September 14, 2017, Toyota reiterated that the ownership change was unauthorized and it "ha[d] been working with [him] for several years to obtain the documents" it needed to evaluate the transaction and "process any renewal." It was not until September 6, 2018, that Toyota finally approved John.

¶ 21    During the discord concerning restructuring, Rothchild wrote to Joseph in January 2016

stating that it was "moral," "right" and "imperative" that he allow Martin to take at least one dealership. Joe Senior would not have wanted Martin to be "forced out" and "[t]here were enough stores to go around." It was also "unfair" that the involuntary withdrawal terms were being "forced" upon Martin, particularly when the drafters anticipated that he would work in a Bredemann dealership "for the rest of his life."

¶ 22    In Rothchild's opinion, Joseph was misusing section 8.4 and it was drafted when "the family was still united" and it was expected that Joseph would be fair to Martin. "Everything was fine at that time" and Joe Senior and Rothchild "never anticipated that there would be *** friction." The clause was intended as a disincentive for a senior manager to voluntarily stop working but continue to collect a full share of profits. The original version of section 8.4 did not even mention involuntary withdrawal and the language had been added in 2002 in case Mary Ann divorced Travnik or he was fired for cause, and if that occurred, then instead of receiving full value, Travnik's payout would exclude the blue sky (good will).

¶ 23    Rothchild further testified that he owed Martin a fiduciary duty when Rothchild executed the amendment which added the involuntary withdrawal language in 2002, and he did not intend to give Joseph the power to fire Martin without cause and fail to pay him fair market value. Deducting blue sky would have been appropriate if Martin had been fired for cause, such as for theft, but section 8.4 was "defective" and misapplied to "a disagreement and a personality clash." According to Rothchild, in "fairness," Martin should be able to choose between a higher buyout figure or a silent partnership. Also, John received the stock from Sally without consideration only because the transfer was supposed to be only temporary while the family discussed restructuring. He should pay for the shares if he is going to keep them permanently.

¶ 24     Joseph testified that B-Team's only function was to hold life insurance on the four siblings working at the dealerships, so their interests could be bought out without financial hardship to the survivors. B-Team simplified the insurance process and meant that each of the many trusts did not have to purchase multiple policies. B-Team was supposed to lease phone equipment to the dealerships in order to pay the insurance premiums, but it would have had to grossly overcharge, so that idea was dropped. After about five years, as the value of the dealerships increased, B-Team bought five more policies and the job of running B-Team went from writing four premium checks per year to writing nine. Joseph accomplished all of B-Team's work in just one day per year. Thomas was the general partner, but Joseph did all of B-Team's work. He wrote insurance premium checks for about 20 years until Thomas removed him from the bank account in December 2019.

¶ 25     Joseph denied selling the Lexus dealership because of his disagreement with Martin, despite an e-mail he wrote to his daughter saying that Martin had caused a family business dispute and "essentially forced the sale of the Lexus Dealership to help solve [it]." Joseph testified that he sold Lexus because it had become less profitable and he was spending more time managing the four dealerships. The sale netted $48 million, most of which went to him as the majority owner, and no longer having to manage Lexus "simplified [his] day somewhat." He admitted that the idea of selling originated during family mediation when they talked about Martin becoming the owner. It would not have been "reasonable" to hire Martin for another Bredemann dealership while he was suing Joseph and John. Also, there were no open senior management positions and Martin's sole interest had always been Lexus. Joseph's pay included $100,000 a year to wind down Lexus and spend about 20 hours per week to "defend all this litigation." Joseph also testified that Joe

Senior's "Rule 1" was that only family members in active senior management took profits. The exception was Mary Ann, who did not work for a dealership, but her husband did, and rather than making an in-law a partner, his employment qualified Mary Ann to income. No one at the Bredemann dealerships had employment agreements, not even the family members.

¶ 26    Joseph further testified that in 2000, attorney Katz prepared a "Family Presentation" which summarized the family business structure and did not support Martin's interpretation of section 8.4. Dealerships had "employees," while "bookkeeping entities," like B-Team, had none. Also, the section 8.4 language that Martin was relying upon was added to the agreements only because Travnik had been a general sales manager, was fired, and then was hired back as a salesperson. The amended language created an exception which prevented him and Mary Ann from being considered "withdrawn" from the partnership. The exception applied only to her trust and was never meant to apply to Martin. Joseph denied that B-Team was an "affiliate" within the meaning of section 8.4. Joseph further testified that the term "affiliates" in section 8. 4 that Martin was relying on was probably incorporated into section 8.4 in anticipation of buying another dealership because the family business was car dealerships. Katz prepared another reference document of the Bredemann companies and Joe Senior's estate plan, in which Katz summarized under the title "Buy/Sell Provisions," that "[t]he test of withdrawal is whether the individual or their spouse works full-time for the dealership." B-Team existed then but it was not included in Katz's document.

¶ 27    Joseph acknowledged that the businesses held $20 million cash at the end of 2017, but that he had written to his siblings during October 2017 that he and John made "business decisions" that "because of the current turbulent situation, the dealerships must conserve as much cash as

possible." Therefore, other than paying taxes, "none of the dealerships will be making distributions to fund any other obligations, wants, or needs of the shareholders, members, or partners, including B-Team." Jospeh denied Martin's allegation that the Lexus dealership paid the other dealerships' expenses and said that the expenses were allocated between them "in an equitable and fair manner."

¶ 28    Katz testified that he was an attorney who specialized in income tax planning, estate taxes, gift taxes, and tax shelters. Joe Senior had been his client from 1990 until his death in 2014. Katz set up all of the family's trusts, corporations and partnerships. He set up three trusts so that Joe Senior could make capital contributions (give shares) to the three children that he employed at the time, but remain liable for the taxes and deplete his estate. For the overall partnership, Rothchild was named the trustee, but Joe Senior was in control and determined when funds could be distributed. After John joined the family business, Katz created the four Meacham trusts and McCabe was named a co-trustee alongside Rothchild. Joe Senior retained controlling ownership, but put the rest of the business into the Meacham trusts. The Meachams were irrevocable trusts, because the of tax advantages, but Katz included a "trap door" by making Sally a discretionary beneficiary so that Joe Senior could always withdraw funds from the trust through her without "upsetting the tax consequences."

¶ 29    Katz's testimony about the origin and purpose of the withdrawal clause in section 8.4 was consistent with Joseph's testimony. Katz also said that the "buy-sell" clause kept ownership to those who were active in "top management" and that businesses "don't succeed with ancillary family members lobbing in nonsense." Another advantage was that financial exit terms were certain and not subject to politicking when someone "leaves the business." No one had an

employment contract or guaranteed job for life. Katz acknowledged that he was paid $800 per hour for his deposition and courtroom appearance, by invoicing the Warren, McKay law firm and receiving checks from "a Bredemann company." In addition to the litigation, Katz helped Joseph with estate planning in 2012, subsequently advised him about two "alternative exits for Marty," and prepared the document in which Sally transferred the voting stock. Katz acknowledged that in a summary he prepared for the family's reference, he indicated that the "buy-sell" would be triggered "when a family member ceases to work in the business, either by retirement, death, or leaving to pursue other opportunities," and that there was no mention of firing or involuntary termination.

¶ 30    Katz acknowledged that the withdrawal clause required employment "by the partnership or its affiliates" instead of a "dealership." Also, B-Team's limited partnership agreement indicated that B-Team was supposed to work in conjunction with the entities that owned the dealerships and real estate, and B-Team was not limited to leasing equipment to the dealerships. Joseph had asked Katz, " 'What would it take to roll out the insurance policies [to the individuals in order] to kill off B-Team." Katz had advised against it, as that would be a "disaster" and "the opposite of estate planning." The phrase "full-time senior management" was an essential term in section 8.4 and the only business of the Bredemanns that Katz was aware of having full-time senior managers was the dealerships. B-Team was just a "paper affiliate" without any senior management.

¶ 31    At the conclusion of the preliminary injunction hearings, the parties tendered proposed findings of fact and conclusions of law. With leave, Martin also filed a supplemental motion for preliminary injunction/offer of proof about his five additional grounds for an injunction. These were grounds that the judge who granted the TRO did not address and which an order *in limine*

had excluded from the preliminary injunction hearings. Martin stated that he wanted the record to be clear that he was asking the court to consider the additional five grounds, and he outlined his arguments and evidence in their favor. It does not appear from the record that the defendants responded to the offer of proof.

¶ 32 Judge Allen Price Walker, having heard the above testimony, issued the preliminary injunction order on appeal. Like the TRO which broadly enjoined "any action to liquidate the ownership interests of the Martin Bredemann Trusts in the Bredemann Companies," the preliminary injunction is broadly worded to protect Martin's interests and encompasses all the dealerships at issue, the detail center, and the underlying real estate.

¶ 33 In arriving at that conclusion, the circuit court first found it was undisputed that Martin had a clearly ascertainable right in need of protection, namely his trusts' ownership interests.

¶ 34 As for irreparable harm in the absence of an injunction, there was the letter to Martin dated February 28, 2020, stating that the involuntary liquidation of his trusts' assets was already underway, and Martin alleged that the net amount would be less than fair market value.

¶ 35 With respect to there being no adequate remedy at law, the court found that Martin was not seeking only money, he was also trying to preserve his rights as an owner to future profits and to vote, and to maintain his other interests in the companies. Furthermore, allowing Martin to seek money damages after his interests had been terminated and assets were removed would not be the most practical and efficient remedy.

¶ 36 Regarding whether there was a likelihood of success on the merits of the claims, Martin had presented two reasons to find that section 8.4 was not triggered. The court firmly rejected Martin's first reason, finding that he did not maintain employment "in a full-time senior manage-

ment position" at a Bredemann organization by contracting to work for B-Team. Because the "base salary" portion of his written contract had been left blank, Martin was an uncompensated volunteer, instead of an employee. The court's discussion of Martin's second argument is the basis for the appeal. The court ruled in Martin's favor, finding that he had "presented a fair question [of] *** a likelihood of success on the merits on whether MJB Trust allows him to name StephenTravnik a beneficiary." We reiterate that the MJB Trust is just one of Martin's three trusts. Through the MJB Trust, Martin owns part of the Ford dealership and the Ford real estate. However, the court found that Martin had *not* raised a fair question on the merits of whether he had effectively exercised the power of appointment for the Martin Trust and the Martin Meacham Trust, *i.e.*, that Travnik is a beneficiary of those two trusts. The Martin Trust was how Martin owned part of the former Lexus dealership and the Lexus real estate; and the Martin Meacham Trust is how he owns part of the Chevrolet dealership, the Toyota dealership, the Chevrolet and Toyota real estate, and the detail center. The sticking point for the appellants is that the preliminary injunction encompasses all of the Bredemann entities, not just the Ford entities.

¶ 37    The court also balanced the hardships, finding that "without the preliminary injunction, Martin's trust would be immediately divested of his ownership interest in the Bredemann Companies" and with the preliminary injunction, the defendants would be under no additional hardship by remaining in partnership with Martin and accountable to him.

¶ 38    Accordingly, the court granted the preliminary injunction. It then stated, "The Court does not address the Plaintiffs' offer of proof because of its ruling in [Martin's] favor."

¶ 39    This appeal followed. The primary appellant is "Bredemann Companies." Eight companies that Joseph and John control are: First Family, Inc. (Chevrolet) Second Family, Inc. (Toyota),

Dempster Development L.P (Chevrolet and Toyota real estate), Adelphi Enterprises, L.P. (Lexus), Adelphi Development, LLC (Lexus real estate), Fraternal Enterprises, L.P. (Ford), Fraternal Development LLC (Ford real estate) and Third Family Development LLC (detail center). The other appellant is "Individual[s] and Management Compan[ies]." These include Joseph, individually; John, individually; and three companies that they control: Dempster Management, Adelphi Management, and Fraternal Management. We will refer to this group as the Management Companies. The Management Companies have adopted the Bredemann Companies' brief as their own and filed a separate brief introducing an additional argument for dissolution of the preliminary injunction.

¶ 40    The purpose of a preliminary injunction is to prevent a threatened wrong or a continuing injurious act pending a trial on the merits of a case. *Kolstad v. Rankin*, 179 Ill. App. 3d 1022, 1034 (1989). An injunction preserves the *status quo* pending that decision. *Id*. The *status quo* is the last, peaceable and uncontested status that preceded the litigation. *Id*. A preliminary injunction is an extraordinary remedy that is warranted only where an extreme emergency exists and serious harm would result if the injunction is not issued. *Id.* at 1030.

¶ 41    When addressing a request for preliminary injunction, the court is not deciding contested issues of fact or determining the merits of the case. *Smith v. Department of Natural Resources*, 2015 IL App (5th) 140583, ¶ 22. At this stage, the plaintiff must establish only that there is a *fair question* as to existence of each of the following factors: (1) that the plaintiff possesses a clearly ascertained right in need of protection; (2) that the plaintiff will suffer irreparable harm without the injunction; (3) that there is no adequate remedy at law for the plaintiff's injury; and (4) that the plaintiff is likely to be successful on the merits of his action. *Id.* at ¶ 21; *Kolstad*, 179 Ill. App. 3d

at 1034. In addition to those factors, the circuit court must conclude that the benefits of granting the injunction outweigh the possible injury which the defendant might suffer as a result. *Kolstad*, 179 Ill. App. 3d at 1031.

¶ 42 A decision to grant or deny preliminary injunctive relief rests within the sound discretion of the circuit court. *Id.* On appeal, we determine whether the party seeking the injunction demonstrated a *prima facie* case that there is a fair question concerning the existence of the claimed rights. *People ex rel. Klaeren v. Village of Lisle*, 202 Ill. 2d 164, 177 (2002).

¶ 43 The Management Companies argue that Martin did not show that a remedy at law (a damage award) would be inadequate, which is the third necessary element for a preliminary junction. They argue that Martin's sole motivation for seeking an injunction was money, as he wants to avoid being paid according to the formula for withdrawing partners instead of what he considers to be fair market value. They argue that his alleged financial harm can easily be redressed because they "have plenty of money to pay any judgment" and Martin has not argued to the contrary. They also contend that the authority cited by the circuit court is distinguishable. Martin responds that his injuries cannot be remedied by money. He does not want to lose his interests in the family business. He argues that the parties are here only because Joseph and John acquired control through fraud and their surreptitious sale of the Lexus dealership, which allowed them to fire him and then use his loss of employment to seize his interests. Martin also contends that the court's findings are well supported by the law.

¶ 44 The Management Companies limit their argument to Martin's testimony during the preliminary injunction hearings and contend that this was his only evidence on this element. However, courts consider the entire record when determining whether irreparable harm would

1-24-1466

occur in the absence of a preliminary injunction. *Gold v. Ziff Communications Co.*, 196 Ill. App. 3d 425, 434 (1989).

¶ 45    The record supports Martin and indicates that the Management Companies are mischaracterizing his claims. Although some of his allegations and requested relief are financial, he pled facts which would also establish a right to injunctive relief and he sought multiple forms of assistance. Martin alleged that as an employee and owner of a closely-held family business, he has reasonably expected to remain in those capacities, but Joseph and John acquired and are misusing their control of the various entities in order to wrongfully push him out. Martin wants to continue his involvement in the business and seeks Joseph and John's removal and his appointment in their stead, which is not a claim for damages. Martin also alleged that his brothers have used their increased authority to move funds and assets amongst the various entities, rebuff his requests for disclosure about those transactions and the sale of the Lexus dealership, and engage in waste and mismanagement. He wants an accounting and access to historical information, which are requests about financial matters, but are not requests for money. His other allegations concern the threatened improper redemption of his ownership interests at below-market value. He wants to halt the sale, that is, if his claims succeed, he will *not* receive money other than income that is periodically distributed to all of the owners. At various points, Martin did seek damages, but his second amended complaint cannot be fairly described as a suit for damages.

¶ 46    Furthermore, his testimony in support of a preliminary injunction addressed non-monetary aspects of his suit. When asked about why he was seeking an injunction and not just money, Martin described a century-old, very closely-held family business that was "unique" and he said that all four stores under the Bredemann brand benefitted from his "energies." This was relevant to his

request to remain in the business. The Management Companies minimize Martin's role in the business because he did not have a right to manage or direct any of the dealerships and is a limited partner. However, as Martin alleged, even lesser partners are entitled to the benefits of their ownership, are owed fiduciary duties, and may access records. Martin's testimony also touched on the comingling of assets and unfair imposition of expenses on the Lexus store which distorted the relative value of the four dealerships, which is testimony that was relevant to his request for historical information about the dealerships and an accounting. His testimony also suggested that, in the absence of injunctive relief, Joseph and John would continue to dissipate or otherwise misuse business assets and further complicate the accounts, all of which could be irreparable. "Usually the *status quo* is maintained by keeping everything at rest and in its present condition." *Gold*, 196 Ill. App. 3d at 432. The intention to redeem Martin's interests is clearly stated in the letter that was sent to him in early 2020, which invoked the involuntary buyout terms after he was abruptly terminated from the Lexus dealership. Martin also elicited testimony and provided e-mails which confirmed that the family has been in discord for some time.

¶ 47 In light of the record, we are not persuaded by the Management Companies' contention that Martin's evidentiary presentation concerned his "emotional attachment to the family business" and suggested that monetary damages would be perfectly adequate compensation.

¶ 48 The circuit court cited *Jacobs v. Regas*, 37 Ill. 2d 578, 583 (1967), in which the majority shareholders in a closely-held corporation were threatening to terminate the minority shareholders' positions as directors and officers, which the appellate court deemed to be "sufficient showing of imminent danger of irreparable damage." Martin indicated that he would suffer similar irreparable harm from the loss of his interests in the Bredemann family organization, particularly when the

various entities are closely-held and intertwined, making it difficult to value them accurately. See

*Superior Investment & Development Corp., Inc. v. Devine*, 244 Ill. App. 3d 759, 770 (1993)

("Stock valuation becomes increasingly difficult and complex where, as in this case, the company

at issue is closely-held and its stock is not publicly traded."); *Central Water Works Supply, Inc. v.*

*Fisher*, 240 Ill. App. 3d 952, 959 (1993) ("a legal remedy is inadequate where damages are difficult

to calculate at the time of the hearing"); *Lumbermen's Mutual Casualty Co. v. Sykes*, 384 Ill. App.

3d 207, 231 (2008) (injunctive relief is only necessary when money is insufficient to compensate

the injury or when the injury cannot be properly quantified in terms of money).

¶ 49    Courts have addressed irreparable harm in each of the following. In *Gold*, a magazine

stopped running greatly discounted ads for a new mail order company, allegedly in breach of the

parties' contract. *Gold*, 196 Ill. App. 3d 425. This was in 1988, when the newly-formed mail order

business was finding all of its customers through the ads (*Gold*, 196 Ill. App. 3d at 434), it could

not survive if it had to pay the full advertising rate, and the publication was the only magazine of

consequence in a specialized field. *Gold*, 196 Ill. App. 3d at 429. A preliminary injunction

prevented the magazine from refusing to honor the substantial discount pending a decision on the

merits. *Gold*, 196 Ill. App. 3d at 430. Under the Management Companies' analysis, the claim in

*Gold* involved money, but the opinion indicates that the loss of a stream of customers, future sales,

and an entire business cannot be calculated and is an irreparable harm. In *Falcon, Ltd. v. Corr's*

*Natural Beverages, Inc.,* 165 Ill. App. 3d 815, 821 (1987), the plaintiff developed a distribution

network to sell the defendant's beverage line and was using that network until the defendant began

selling directly to the subdistributors, allegedly in tortious inference and breach of contract. The

circuit court issued a preliminary injunction, which the appellate court affirmed, noting that

"immediate damages in loss of commissions may be calculable, [but] the injury to plaintiffs' reputation and good will, and the resulting loss of existing and future business, is incalculable." *Id.* at 820. Further, "The loss of sales and customers as well as the threat of continuation of such losses to a legitimate business interest, as alleged by plaintiffs in the present case, have been held sufficient to constitute irreparable injury." *Id.* at 821. "An injury is irreparable when it is of such a nature that the injured party cannot be adequately compensated in damages or when damages cannot be measured by any pecuniary standard." *Id.* at 821 (internal citation omitted); Another illustration is *David Kindred Integrated Medicine, P.C. v. Snider*, 2014 IL App (3d) 130937-U, in which Snider's contract to sell his integrative medicine practice included a noncompete clause covering 30 miles for three years. Snider moved his office across the country but informed his former patients by mail that he had a new Internet-based practice and his website announced that the new practice was " 'much more affordable and convenient,' " offered blood draws and in-person visits at each patient's location, and invited them to call at their earliest convenience in order to maintain continuity of care. *David Kindred Integrated Medicine*, 2014 IL App (3d) 130937-U, ¶¶ 6-7. If Snider had continued in this vein, the old practice would have irreparably lost the patient base and competitive position that it had purchased from him. *David Kindred Integrated Medicine*, 2014 IL App (3d) 130937-U, ¶ 22. In *Travelport, LP v. American Airlines, Inc.*, 2011 IL App (1st) 111761, ¶ 10, a major airline threatened to cut off an online travel agency's access to complete information about the airline's tickets, which would have driven customers to the travel agency's competitors. One of the witnesses likened it to " 'having a supermarket where people came to walk around and then they left to go buy elsewhere.' " *Id*. Without injunctive relief, there would have been the irreparable injuries of loss of customers and sales, reputation, and ability to

attract new customers, and also, an affiliated company anticipated that it would be forced out of business. *Id.* While the parties might have been able to estimate the immediate loss of travel bookings, they could not reasonably quantify the resulting loss of future customers and revenue (*Id.* at ¶ 37), which justified the issuance of the preliminary injunction.

¶ 50    This is only some of the authority which indicates that the type of injuries at issue were incalculable at the time of hearing and would warrant a preliminary injunction. Martin argued that the defendants were mishandling the Bredemann family business assets, confusing the accounts, and irreparably concluding Martin's ownership in the closely-held business, contrary to their legitimate authority. "A preliminary injunction does not anticipate or depend upon the ultimate conclusion to be reached upon the rights involved in the litigation." *Gold*, 196 Ill. App. 3d at 431. "The mere existence of a remedy at law, or the fact that a monetary judgment may be the ultimate relief, does not deprive the trial court of its power to grant injunctive relief if that remedy is inadequate." *Ron & Mark Ward, LLC v. Bank of Herrin*, 2024 IL App (5th) 230274, ¶ 62.

¶ 51    Martin needed to show only a fair question of irreparable harm. *Kolstad*, 179 Ill. App. 3d at 1034. The record and legal principles indicate that Martin met his burden through testimony and documentary evidence.

¶ 52    In the Bredemann Companies' brief, the appellants argue that the order is internally inconsistent because the court found that Martin raised a fair question only on the merits of the MJB Trust, which held equity in the Ford dealership entities, but the injunction encompasses all of the defendant entities, even those which the court had found there was no fair question.

¶ 53    We note that the court did not explain why the order encompassed the Chevrolet dealership entities, Toyota dealership entities, and detail center entities. Apparently, none of the parties

anticipated or advocated for this ruling, and the appellants did not seek clarification or reconsideration before filing this appeal seeking reversal of the order as to the non-Ford groups.

¶ 54    Martin responds that the circuit court had considerable discretion in crafting an injunction necessary to protect the interests at stake in the litigation, and that the circuit court likely viewed this case through the broader lens of the Bredemann businesses as an integrated whole, rather than the narrow lens that the appellants favor. He argues that the order preserves the *status quo* by stopping the efforts to oust him and Mary Ann from the family business.

¶ 55    The appellants reply that under Illinois law, the circuit court erred by lumping the corporations together as if they were one. The appellants argue that corporations are distinct from affiliated corporations, even when under common ownership or when controlled by common officers and directors. *Main Bank of Chicago v. Baker*, 86 Ill. 2d 188, 204-05 (1981).

¶ 56    Illinois law provides that "an injunction should be as definite, clear and precise in its terms as [] possible so that there may be no excuse or reason for failing to comprehend or obey its prohibitions." *Kolstad*, 179 Ill. App. 3d at 1034 (internal citation omitted). The act enjoined or directions given must be stated with such precision that one can understand exactly what is forbidden and the injunction is capable of enforcement or execution. *Id.* Also, "[t]he restraint imposed by an injunction should not be more extensive than is reasonably required to protect the interests of the party in whose favor it is granted, and should not be so broad as to prevent [a] defendant from exercising his [or her] rights." *Id*.

¶ 57    None of the defendants disagree with Martin's contention that the Bredemann entities are financially intertwined. He contends that the court was aware of the financial entanglement and recognized the need for a preliminary injunction over the entire family business, instead of

confining the scope to the Ford entities. This is his explanation, after the fact, for the breadth of the order. He did not seek this particular combination of factual findings and injunctive relief. It did not appear in his motion for a preliminary injunction or in the proposed findings of fact and conclusions of law that he tendered to the court after the hearing. The defendants did not brief the possibility either. After the order was issued, the defendants failed to request clarification or reconsideration of the order before coming here to argue that it exceeds its factual footing. From this record, we cannot tell what limitations would be necessary to maintain the *status quo* and protect Martin's interests. The record is underdeveloped and we cannot determine whether the discretionary ruling is indeed too broad.

¶ 58    Furthermore, the record is inexplicably thin with respect to Martin's other arguments for injunctive relief. Sally and Martin's successful joint motion for a TRO presented six separate bases for temporary relief, but the circuit court addressed only the first one and did not express an opinion about the other five. The judge hearing the TRO did not specify why he was basing his decision on a single argument when six were offered. Martin needed to succeed on only one argument to obtain a TRO. Additionally, the TRO order was entered at the beginning of the global COVID-19 pandemic, on Friday, March 13, 2020, which was also when the chief judge of the Cook County circuit courts took the extraordinary measure of ordering that almost all civil matters be rescheduled and continued for 30 days. See General Administrative Order No. 2020-01, COVID-10 [*sic*] Emergency Measures. https://www.cookcountycourt.org/order/general-administrative-order-no-2020-01-covid-10-emergency-measures (last visited April 25, 2025); *Leach v. Dep't of Employment Security*, 2020 IL App (1st) 190299, ¶ 44 (information on public websites is subject to judicial notice). The effects of the pandemic were unpredictable and it was uncertain when the

circuit court system would return to normal. Under these circumstances, the judge hearing the TRO may have felt pressed to issue a decision as quickly and efficiently as possible.

¶ 59    However, the record does not disclose why that judge and the judge who later presided over the case then restricted the discovery and preliminary injunction evidence to the first of the six arguments. We cannot conceive of any reason why either judge would prevent Martin from investigating his allegations and presenting all of his grounds for relief.

¶ 60    Martin was allowed to file an offer of proof, in which he stated, "in order to ensure that the record is clear, we submit this filing in which we move the Court to also consider each of the other five grounds *** in support of the request to convert the TRO into a preliminary injunction." Martin summarized the five other arguments as follows:

> "(2) interpreting the governing documents to allow the force out of a family member who remains ready, willing and able to work in the family businesses is 'defective' and contrary to the intent of those documents, as expressed by their signatories, trustees Rothschild and McCabe;
>
> (3) Joe Jr. and John's numerous material breaches of the governing documents, as alleged in paragraphs 49-58 of Martin's complaint and described briefly above, preclude them from now trying to use those same documents for their benefit by forcing Martin out;
>
> (4) Joe Jr. and John's efforts to force Martin out of the business over the objection of their mother Sally has been facilitated by the control they have over Bredemann Toyota after they fraudulently deceived their mother into giving them that control, and they should not be permitted to benefit from their fraud;

(5) Joe Jr. and John's numerous material breaches of fiduciary duty, as alleged in paragraphs 49-58 of Martin's complaint and described briefly above, preclude them from forcing Martin out; and

(6) forcing Martin out of the family businesses would breach the duty of good faith inherent in the company, partnership and shareholder agreements. (Motion for TRO, Ex. EE, ¶¶16-21)."

¶ 61    In the 24-page offer of proof, Martin set out legal principles, arguments and supporting evidence. For instance, with respect to the third argument, that Joseph and John were misusing the governing documents, Martin contended that it is black letter law that a party must perform his or her own contractual obligations in order to enforce that contract. He argued Joseph and John could not, on the one hand, invoke section 8.4's involuntary withdrawal clause against him, when they, on the other hand, had materially breached sections 5.1 and 5.7 (by commingling expenses between dealerships) and section 4.1 (by failing to distribute available cash). He cited exhibits regarding misallocated expenses and quoted e-mails and depositions. It does not appear that the defendants countered the offer of proof. When the circuit court entered the order on appeal, it specified, "The Court does not address the Plaintiff's offer of proof because of its ruling in [the] Plaintiff's favor." Based on this record, it is unclear whether any of Martin's unexamined arguments for injunctive relief have merit and would be additional or alternate bases for that relief.

¶ 62    A similar situation occurred in *Kolstad*, 179 Ill. App. 3d 1022, which was a private nuisance suit in which a preliminary injunction was entered that the defendant argued was overbroad. Both sides proposed modifications to the injunction's breadth, but with an underdeveloped record, the appellate court was hamstrung and "unable to determine what limitations would be appropriate."

*Id.* at 1035. It concluded that the circuit court was "certainly empowered to consider evidence along these lines and modify the order [on remand]." *Id.* It directed the court to conduct a hearing and modify the order. *Id.*

¶ 63    We have formed no opinion about the merits of the preliminary injunction, only that the proceedings might have been unduly constrained and that the record is definitely insufficient for review. Therefore, we remand with directions to clarify the basis and scope of the preliminary injunction. To be clear, the circuit court is empowered to enter any orders and conduct any proceedings it deems warranted to obtain that clarification and modify the preliminary injunction order as it sees fit. *Id.*

¶ 64    Remanded with directions.